Honorable Deborah L. Thorne, United States Bankruptcy Judge
Introduction & Background
This matter conies before the court upon the motion of the trustee to have default judgments entered against various defaulted Defendants in these proceedings. Namely, the trustee seeks the entry of a default judgment against Zig Zag Corporation (Zig Zag), ZZC, Inc.,[1] Michael Wolf, Scott Wolf, Peter Wolf, SHBM, Inc. (SHBM), Hound Ventures, Inc. (Hound Ventures), and MMQB, Inc (referred to throughout as MMQB, Inc. so as not to *748 confuse the entity with the underlying "MMQB business" allegedly held by this entity and others). All have been defaulted either for failing to answer or for having disregarded this court's discovery orders.
For reasons given more fully below, the court finds for the trustee and against Scott Wolf on Counts 1, 5, 6, 7, 8, 9, and 12 of the complaint. The court also finds for the trustee and against ZZC, Inc. on Counts 1, 7, 8, 9, and 10 of the complaint. The court further finds for the trustee and against Michael Wolf on Counts 15, 16, 17, and 18 of the complaint. The court would find for the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint but for constitutional concerns, so the court will issue a separate order delineating Parts II, III, IV, VI.a, VI.g.1, VI.h.1, VI.i.1, and VI.r.2 of this opinion as its proposed findings of fact and conclusions law, with one of the court's ultimate proposed conclusions of law being that judgment be entered in favor of the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint.
The trustee's theory, in the main, concerns the alleged transfer of a family publishing business, the Monday Morning Quarterback (MMQB business), in late 2011 or early 2012 from one corporation (Zig Zag) wholly owned and controlled by the Debtor, Michael Wolf, to another corporation (ZZC) initially wholly owned and controlled by the Debtor. Allegedly, 51% of the stock in ZZC was, at the time that ZZC still owned the MMQB business, transferred from Michael to Scott Wolf, Michael's son, as well. The MMQB business was then transferred to another corporation (MMQB. Inc.) wholly owned and controlled by Scott Wolf.
Then, as alleged,[2] MMQB, Inc. funneled income from the business to various other related entities, including Hound Ventures and SHBM, Inc.,[3] as well as to Scott Wolf and Michael Wolf. This type of income-transferring happened when the MMQB publishing business was earlier held by the ZZC entity, as well.
Allegedly, the Debtor's marital problems precipitated these transfers. He wanted the value of the business kept out of the hands of his then-existing and potential future creditors, most prominently his then-wife Elizabeth Wolf.
In December of 2013, divorce proceedings commenced. In July of 2014, the Debtor filed for bankruptcy. In early 2016, the trustee filed the present adversary proceeding seeking, in substance, to recover the value of the MMQB business for the benefit of the Debtor's estate.[4]
*749 Some Defendants failed to answer; others failed to comply with discovery orders. These Defendants were then held in default. The trustee's request for default judgment against these Defendants has now followed. This opinion concerns that request.
Discussion
I. Jurisdiction and Authority
a. Jurisdiction
The District Court has jurisdiction over all proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Most of the counts in this case - those based on turnover, fraudulent conveyance, preference, and post-petition transfer theories - arise under title 11, namely sections 542, 544, 547, and 548, and 549 of the Bankruptcy Code. The same is true of the counts relating to the Debtor's discharge, which arise under section 727 of the Bankruptcy Code.
Some of the remaining counts - those based on state law alter ego,[5] constructive trust, resulting trust, and breach of fiduciary duty / corporate waste theories, which could exist outside of the bankruptcy and which do not in and of themselves arise under any provision of title 11 - are at least "related to" the underlying bankruptcy case because their outcome affects the amount of property in the bankruptcy estate. See Zerand-Bernal Grp., Inc. v. Cox , 23 F.3d 159, 161-62 (7th Cir. 1994).
The remaining state law counts - those based on the injury to the estate caused by the Debtor's alleged tortious interference with the estate's post-petition contracts and business relations - "arise in a case under title 11" because, while based on state law tortious interference theories, the causes of action could not exist outside of this bankruptcy proceeding due to the fact that they arise out of an alleged post-petition injury practiced upon the estate, its business relations, and its contract rights vis-a-vis the attempted liquidation (sale) of property of the estate. See Matter of Wood , 825 F.2d 90, 97 (5th Cir. 1987) ("In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.").[6]
"Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a) (emphasis added). All of the proceedings created by the assertion of these causes of action may therefore be referred by the District Court to the Bankruptcy Court. All of the proceedings created by these causes of action have, in fact, been referred to this Bankruptcy Court by the District Court for the Northern District of Illinois. See N.D. Ill. L.R. 40.3.1(a).
Jurisdiction therefore exists over all of these causes of action.
b. Statutory Authority
"Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under *750 subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). The statute then goes on to give examples of core proceedings. See 28 U.S.C. § 157(b)(2).
Here, the fraudulent transfer counts, both those based directly on section 548 and those based on the UFTA/section 544(b), are core. See 28 U.S.C. § 157(b)(2)(H). On the facts of this case, the constructive/resulting trust counts are also statutorily core,[7] since these trust counts both concern an alleged transfer of property for no consideration (or consideration supplied by the Debtor) in fraud of creditors' rights giving rise to an equitable ownership interest in favor of creditors the enforcement of which would effectively unwind (avoid and recover) the fraudulent transfer; that is, the trust counts' strong substantive resemblance in this case to true statutory UFTA/548 fraudulent conveyance actions makes them statutorily core. Cf. Republic Credit Corp. I v. George K. Boyer (In re Boyer) , 372 B.R. 102, 105 (D. Conn. 2007), aff'd , 328 F. App'x 711 (2d Cir. 2009).[8]
Both the preference count, see 28 U.S.C. § 157(b)(2)(G), and the section 549 count, see In re Auxano, Inc. , 96 B.R. 957, 960 (Bankr. W.D. Mo. 1989), are core. There is also no doubt that the objection to the Debtor's discharge is core. 28 U.S.C. § 157(b)(2)(J). Likewise, the turnover count is core. 28 U.S.C. § 157(b)(2)(E). The tortious interference counts are also core because they arose post-petition in favor of the estate based on a post-petition contract entered into for the purpose of liquidating estate property (one of the pieces of real property owned by the estate). See 28 U.S.C. § 157(b)(2)(A), (O).
For the remaining counts, each is core if "it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." Barnett v. Stern , 909 F.2d 973, 981 (7th Cir. 1990) (internal quotations and citations omitted). A state law alter ego action would not seem to fit this definition, and nowhere is such an action listed in section 157(b)(2). Nevertheless, perhaps because this type of action normally seeks a declaration that certain property only nominally held by third-parties is really property of the estate, it has been said that such an action is statutorily "core." See Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago , 649 F.3d 539, 550 (7th Cir. 2011) (noting that the action before the bankruptcy court in the Barnett case, an action to declare a trust to be the alter ego of the debtor and the assets of the trust to be property of the estate, was a core proceeding); but see Barnett , 909 F.2d at 981 (declining to adopt the broader formulation of core proceedings as those that have the effect of bringing property into the estate);
*751 Matter of U.S. Brass Corp. , 110 F.3d 1261, 1268 (7th Cir. 1997). As such, the court will treat the alter ego / reverse-veil piercing claim in this case as statutorily core.
Finally, what of the cause of action asserted against officer/director-of-ZZC Scott Wolf for allegedly breaching a fiduciary duty and/or wasting ZZC's corporate assets? Such a cause of action is statutorily non-core. See In re Integrated Health Serv's., Inc. , 291 B.R. 615, 618 (Bankr. D. Del. 2003).
Thus, this court has statutory authority to enter a final judgment on each claim except for the claim asserting a breach of fiduciary duty / corporate waste.
c. Constitutional Authority
The court must also, however, satisfy itself that it has the constitutional authority to enter a final judgment. Stern v. Marshall , 564 U.S. 462, 482, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment ... Article III of the Constitution does not.").
This court has the constitutional authority to enter a final judgment concerning the fraudulent transfer claims. See In re Peregrine Fin. Grp., Inc. , 589 B.R. 360, 364-65 (Bankr. N.D. Ill. 2018) ; In re Kimball Hill, Inc. , 480 B.R. 894, 906-07 (Bankr. N.D. Ill. 2012) ; see also In re Millennium Lab Holdings II, LLC , 575 B.R. 252, 268-69 (Bankr. D. Del. 2017). Due to their substantive resemblance in this case to fraudulent conveyance actions, the same is true of the non-statutory resulting/constructive trust claims based on fraud and unjust enrichment.
There is also no Stern issue with the preference claim, see, e.g. , In re Pantazelos , 543 B.R. 864, 872-73 (Bankr. N.D. Ill. 2016), nor with the section 549 claim. In re Felice , 480 B.R. 401, 427-28 (Bankr. D. Mass. 2012). The objection to the Debtor's discharge obviously does not run afoul of Stern in any respect, and the court may enter final judgment on those counts. See Stern , 564 U.S. at 499, 131 S.Ct. 2594. While based on state law, the tortious interference counts stem from the bankruptcy itself since they are post-petition causes of action based on the alleged tortious interference with post-petition estate contracts and business relations arising out of the sale and liquidation of estate property. See id. Therefore, the court may enter final judgment on the tortious interference counts.
The alter ego claim is different. Though statutorily core, the Seventh Circuit ruled in Wellness that the bankruptcy court could not constitutionally enter a final order in such an action, at least where the allegations are that the debtor's trust[9] is the alter ego of the debtor. Wellness Int'l Network, Ltd. v. Sharif , 727 F.3d 751, 773-76 (7th Cir. 2013), rev'd on other grounds , --- U.S. ----, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015). The Supreme Court did not reverse the Seventh Circuit on the basis that this conclusion was incorrect, but rather on the basis that, regardless of whether the alter ego claim in Wellness was a Stern claim or not, the parties could have consented to the bankruptcy court's authority to enter a final order on the claim. See Wellness Int'l Network, Ltd. v. Sharif , --- U.S. ----, 135 S.Ct. 1932, 1942 n.7, 191 L.Ed.2d 911 (2015) ; Wellness , 135 S.Ct. at 1954 (Roberts, C.J., dissenting) (describing the majority's holding). In light of the pertinent part of the Seventh Circuit's opinion in Wellness , which was not disapproved of by a majority of the Supreme Court, this court will treat the alter ego claim in this case as one on which it *752 may not constitutionally enter final judgment.
Thus, even though it is statutorily core, the court cannot constitutionally enter a final judgment on the alter ego claim in this case. It may constitutionally enter a final judgment on every other statutorily core claim, however. Considered together, the court may not, without litigant consent, enter a final judgment on either the corporate waste / breach of fiduciary claim or the alter ego claim.
d. Consent
The bankruptcy court's lack of authority may be cured by litigant consent, express or implied. This is true for proceedings that are statutorily non-core. 28 U.S.C. § 157(c)(2). It is also true for proceedings that are statutorily core but that lie outside of the constitutional authority of the bankruptcy court. Wellness , 135 S.Ct. at 1948-49. The trustee has expressly consented to the entry of final judgments. In their initial answers, it can fairly be said that Michael and Scott Wolf expressly withheld consent to the bankruptcy court's entry of final judgments, as have MMQB, Inc., Hound Ventures, and SHBM. Zig Zag and ZZC have never filed an answer and, to this court's knowledge, have never been represented by counsel in this proceeding, thereby necessarily precluding these entities from having taken a legal position on this court's authority. "A corporation may appear in federal courts only through licensed counsel." Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council , 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993).
Scott Wolf, however, filed a motion for summary judgment, asking this court to enter an order dismissing with prejudice certain counts of the complaint for failing to state a claim upon which relief could be granted, based in part on a divorce ruling that was issued during the pendency of these adversary proceedings.
He argues that Counts I-IX[10] should be dismissed with prejudice because a transfer of corporate property is not a transfer of shareholder property,[11] and the trustee's alter ego theory, which, if legally sound, would accomplish the required linkage between shareholder and corporate property in this case, is impermissible as a matter of Illinois law; further, he argues that Rule 9(b) is not met with respect to the fraudulent transfer counts, and, in any event, any possible recovery on any count belongs to Elizabeth Wolf, not the estate, due to the final divorce court ruling. Hence Counts I-IX, those dealing with alter ego, constructive and resulting trust, and fraudulent transfers, should, according to Scott, be dismissed with prejudice. Similarly, the tortious interference counts (XIII-XIV) should be dismissed with prejudice due to the fact that the marital home (and/or the proceeds of its sale) is no longer estate property, and the claims arise out of the interference with the estate's contract to sell that property. Likewise, the fiduciary duty / corporate waste claim (Count XII) should be dismissed because, according to Scott, the stock in ZZC out of which such claim arises has been awarded entirely to Elizabeth Wolf, rendering the trustee without standing to assert a claim based on the estate's ownership of that stock, which is derivative of Michael Wolf's ownership on the petition date. Scott then also argues that counts XIX-XXIV should be dismissed for essentially the same reason as the other fraudulent transfer counts:
*753 the property that was transferred was not property of the Debtor (either because it was corporate property or because any recovery would now inure to the benefit of Elizabeth Wolf due to the marital division), and in the case of section 549 count (Count XXIV), the property transferred post-petition (if any) was not, as a matter of law, estate property.
Thus, Scott Wolf has asked this court for a final judgment as a matter of law in his favor on Counts 1-9, 12-14, and 19-24. Scott Wolf has therefore consented to the entry of final judgment on those counts. In re Clean Burn Fuels, LLC , 540 B.R. 195, 199 n.2 (Bankr. M.D.N.C. 2015) ; In re Carter , 506 B.R. 83, 88-89 (Bankr. D. Ariz. 2014) ; In re Pearlman , 515 B.R. 887, 892 n.21 (Bankr. M.D. Fla. 2014). This court may statutorily and constitutionally enter final judgment on all counts as against Scott Wolf.[12]
Michael Wolf filed a motion for summary judgment arguing substantially the same things as Scott Wolf, in addition to arguing that the counts aimed at denying him his discharge fail to state a claim as a matter of law. See Michael Wolf's Mot. Summ. J., Docket No. 589. Thus, he is deemed to have consented to final judgment on all counts except for Counts 10-11.[13] Clean Burn , 540 B.R. at 199 n.2 ; Carter , 506 B.R. at 88-89 ; Pearlman , 515 B.R. at 892 n.21.
Zig Zag and ZZC were served with summons indicating in clear terms that a failure to respond would result in their implied consent to this court entering final orders; they never filed an answer in this case and are not represented by legal counsel. A final judgment may be entered against them. See In re Oldco M Corp. , 484 B.R. 598, 614-15 (Bankr. S.D.N.Y. 2012) ; In re Hoku Corp. , 2015 WL 8488949, at *2-3 (Bankr. D. Idaho Dec. 10, 2015).
MMQB, Inc., Hound Ventures, and SHBM first filed an answer indicating their lack of consent to bankruptcy court adjudication. To this court's knowledge, they never filed a motion for summary judgment or any other dispositive motion asking for a final judgment that would repudiate that initial withholding of consent. They are not now represented by counsel. No final judgment will be entered against Hound Ventures and SHBM at any rate; the business was never transferred to them (per the complaint), and the factual material in the record is not sufficient to allow a judgment to be liquidated against them based upon their receipt under section 550(a)(2) of the proceeds/products/profits of the MMQB business.
MMQB, Inc., owing to the trustee's alter ego theory and his fraudulent transfer theories, however, would be held liable by this court as a subsequent transferee of the business. Given MMQB, Inc.'s lack of consent, however, the alter ego Stern claim (which is absolutely vital to the success of the trustee's fraudulent transfer theory pinning liability on MMQB, Inc.) cannot be finally adjudicated as against it so as to support a final judgment.
Hence, final judgment will be entered on all counts. The only exception to this is with respect to Count 1 and Counts VII-IX as to MMQB, Inc. (which withheld consent and then did not file any motion for entry of a final judgment in its favor), for which the court will issue proposed findings of *754 fact and conclusions of law per Fed. R. Bankr. P. 9033. See Exec. Benefits Ins. Agency v. Arkison , 573 U.S. 25, 134 S.Ct. 2165, 2172-74, 189 L.Ed.2d 83 (2014) ; 28 U.S.C. § 157(c)(1).
II. Legal Standard
There is a two step process for obtaining a default judgment. VLM Food Trading Int'l, Inc. v. Illinois Trading Co. , 811 F.3d 247, 255 (7th Cir. 2016) ; In re Catt , 368 F.3d 789, 793 (7th Cir. 2004). First, the party against whom default judgment is sought must be held in default. Catt , 368 F.3d at 793. Certain of the Defendants in these cases have been held in default as a sanction for having failed to comply with discovery orders. See Order, Docket No. 566; Opinion, Docket No. 574; Order, Docket No. 575; Fed. R. Civ. P. 37(b)(2)(A)(vi) ; Fed. R. Bankr. P. 7037. "The basic effect of an entry of default (step one) is that [u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true." VLM Food , 811 F.3d at 255 (quoting Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc. , 722 F.2d 1319, 1323 (7th Cir. 1983) ).
Next, an actual default judgment must be entered. The entry of default alone does not establish an entitlement to relief. VLM Food , 811 F.3d at 255 (noting that the entry of default does not determine rights). It merely denies the party held in default the opportunity to contest any of the facts properly alleged in the complaint. See In re Fundakowski , 557 B.R. 268, 269 (Bankr. D.R.I. 2016). The Plaintiff must, however, establish that the well-pleaded facts found in the complaint, if taken as true, amount to a legally cognizable claim for relief upon which a judgment may be entered. See Nishimatsu Const. Co. v. Houston Nat. Bank , 515 F.2d 1200, 1206 (5th Cir. 1975) (citing and discussing Thomson v. Wooster , 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885) ). Thus, even after entry of a default, the defaulted Defendant may attack the sufficiency of the complaint. Matter of Hunt's Health Care, Inc. , 161 B.R. 971, 979 (Bankr. N.D. Ind. 1993).[14]
The standard to be applied is essentially the same as that employed when evaluating a complaint based on a motion to dismiss under Rule 12(b)(6). See Surtain v. Hamlin Terrace Found ., 789 F.3d 1239, 1245 (11th Cir. 2015). Unlike in the pleading stage of litigation, however, a judgment may not be entered based on inconsistent theories of relief. See, e.g. , Lawson v. Life of the S. Ins. Co. , No. 4:06-CV-42 (WLS), 2008 WL 11342635, at *3 (M.D. Ga. June 19, 2008) ; see also Fredonia Broad. Corp. v. RCA Corp. , 481 F.2d 781, 801 (5th Cir. 1973) ; In re Stangel , 593 B.R. 607, 609-10, 2018 WL 4945692, at *1 (Bankr. E.D. Wis. Oct. 10, 2018). These principles apply with equal weight even where a default judgment is sought as a discovery sanction under Rule 37 and not for failure to defend. See Microsoft Corp. v. Computer Care Ctr., Inc. , No. 06-CV-1429 SLT, 2008 WL 9359718, at *5 (E.D.N.Y. Apr. 8, 2008) ; see also Parlier v. Casteen , No. 514CV00085RLVDCK, 2016 WL 3032692, at *1 (W.D.N.C. May 26, 2016).
Additionally, where, as here, the damages sought are not for a sum certain, the Plaintiff must provide evidence as to the appropriate amount of damages. Catt , 368 F.3d at 793. A hearing is not always necessary, and, in light of the detailed evidence presented in support of the *755 damages sought in this case, the court determines that a hearing on damages is not required in this case, since the evidence submitted allows for a definite computation of damages to be made. See Domanus v. Lewicki , 742 F.3d 290, 304 (7th Cir. 2014) ; Dundee Cement , 722 F.2d at 1323 ; Fustok v. ContiCommodity Serv's., Inc. , 873 F.2d 38, 40 (2d Cir. 1989) ("While it is true ... that the damages in this case were neither liquidated nor capable of mathematical calculation, it was not necessary for the [lower court] to hold a hearing, as long as it ensured that there was a basis for the damages specified in a default judgment.") (emphasis added); Fed. R. Civ. P. 55(b)(2). In any event, no defaulted Defendant has formally requested a hearing on the damages amount, and the court therefore deems any argument to the effect that a hearing is required to have been forfeited and/or waived.
In sum, it follows that if the judgment sought is supported by a legally sufficient complaint and if the damages sought are supported by appropriate evidence, a default judgment may be entered for the amount(s) requested.
III. The Trustee's Standing/Authority
a. The Family Court Property Division
The trustee's standing and/or authority to bring these causes of action is at the heart of this case. The Wolf's (Scott and Michael) first argue that the issuance of a divorce ruling dividing the marital property of Elizabeth and Michael Wolf precludes the trustee from maintaining these causes of action. It does not.
Illinois is a common law property state. See In re Marriage of Evans , 85 Ill.2d 523, 55 Ill.Dec. 529, 426 N.E.2d 854, 857 (1981). During the marriage, each spouse has the legal right to deal with his/her own property in whatever manner he/she deems fit. 750 ILCS § 65/9 ; Kujawinski v. Kujawinski , 71 Ill.2d 563, 17 Ill.Dec. 801, 376 N.E.2d 1382, 1387 (1978) ; People v. One 1990 Chevrolet Suburban, VIN 1GNER16K7LF1628 , 229 Ill.App.3d 1114, 178 Ill.Dec. 653, 605 N.E.2d 92, 94 (1992). That is, for example, if one spouse owns stock in a corporation, the other spouse has no interest, legal or equitable, in the stock merely by virtue of being the stock owner's spouse.
Upon the filing of a divorce petition, however, the concept of marital property becomes key. See 750 ILCS § 5/503(a) (defining marital property). If, at the time of the divorce petition, one spouse owns property that is also marital property, then his/her independent ownership ceases, and each spouse acquires a contingent interest in the property. See 750 ILCS § 5/503(e) ; In re Thorpe , 881 F.3d 536, 539-40 (7th Cir. 2018). "When the divorce court eventually divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest. Conversely, the spouse who is not awarded the property sees his contingent interest vanish." Thorpe , 881 F.3d at 540.
In this case, Elizabeth Wolf (Michael Wolf's then-wife) filed a divorce petition in December of 2013. In July of 2014, Michael Wolf filed for bankruptcy. In late 2017, the family court judge divided the marital property 100% in favor of Elizabeth Wolf.[15] Hence, it follows that any marital property Michael Wolf owned on the divorce-petition date that was divided *756 in favor of Elizabeth Wolf no longer belongs to the bankruptcy estate.[16]
This court does not know exactly which marital property was owned by Michael and Elizabeth Wolf in late 2013 that would have been subject to the family court's property division award. Helpfully, however, the family court has provided a description in its final judgment dissolving the Wolf marriage:
[Elizabeth Wolf] is awarded the marital estate, comprised of Respondent's 49% interest in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in in New Mexico, the Fiat automobile, the Mercedes Benz [Elizabeth Wolf] drives.
See Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. A, at 3.
The family court's pertinent findings and rulings, which preceded the entry of final judgment, do not contradict this language:
Mr. Wolf asserts no interest in any marital assets and assigns any interest that he might have in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, a Fiat automobile, the Mercedes Benz that Mrs. Wolf drives, his forty-nine per cent (49%) interest in Zig Zag Corporation and any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter claim on file) to Mrs. Wolf.
See Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. B. at 8.[17]
The court then goes on to say, more or less, that it will indeed award those properties to Mrs. Wolf to the extent that it can do so given the pending bankruptcy case. Id. Of course, Michael Wolf had no ability to "assign" anything to Elizabeth Wolf; he simply had no property to transfer (his property, including his contingent interests in the marital property, had long since become property of the estate under section 541). But the stay had been lifted to allow the family court to make a property division, which it did. That the family court made the division based on Michael Wolf's offer is of no moment in these proceedings.[18]
As pertinent to this proceeding, then, the estate owns 51% of the equity in Zig Zag Corporation and 49% of the equity in ZZC. This court does not see how the estate's loss of 49% of the equity in Zig Zag Corporation to Elizabeth Wolf affects the trustee's ability to bring any of the *757 causes of action he is currently bringing. As seen below, many if not most of the trustee's causes of action are not strictly derivative of the Debtor's pre-petition property rights in any event. If Elizabeth Wolf believes that the marital property division in her favor allows her to assert an ownership interest or other property interest in any recovery gained by the trustee on any cause of action asserted in these proceedings, she is free to make that argument to this court. Otherwise, any proceeds actually recovered from these causes of action will be distributed to the estate's creditors, with any surplus going to the Debtor. See 11 U.S.C. §§ 541(a)(1), (3), (7), 726(a).[19]
b. The Trustee's Statutory Authority' to Bring these Causes of Action
The question raised by the Wolf's in these proceedings is not so much one of "standing" or justiciability as one of the trustee's authority under the Bankruptcy Code to bring the causes of action that he asserts. See Grede v. Bank of New York Mellon , 598 F.3d 899, 900 (7th Cir. 2010) ("Whether a given action is within the scope of the Code is a question on the merits rather than one of justiciability."). This court will therefore discuss the trustee's statutory authority.
The trustee must look to the Bankruptcy Code alone for his authority to bring a cause of action. First, and most easily, certain sections of the Code, such as sections 547, and 548, give the trustee direct authority to prosecute the causes of action described in those sections. See 11 U.S.C. §§ 547, 548.
Second, sections 541(a)(1) and 323 allow the trustee to assert pre-petition causes of action belonging to the debtor on the petition date. See Matter of Geise , 992 F.2d 651, 655 (7th Cir. 1993) (noting that section 541(a)(1) includes causes of action owned by the Debtor). The trustee's rights under section 541(a)(1) are by definition no greater than the debtor's; thus, for instance, the trustee cannot succeed on a section 541(a)(1) cause of action where the debtor would necessarily have failed. See Bank of Marin v. England , 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966) ; Zartman v. First Nat. Bank of Waterloo , 216 U.S. 134, 135, 30 S.Ct. 368, 54 L.Ed. 418 (1910) ; Peterson v. McGladrey & Pullen, LLP , 676 F.3d 594, 596 (7th Cir. 2012) ; In re Graham Square. Inc. , 126 F.3d 823, 831 (6th Cir. 1997) ; Matter of Sanders , 969 F.2d 591, 593 (7th Cir. 1992) ; In re Cent. Illinois Energy Coop. , 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("A trustee's rights under section 541 are derivative of those held by the debtor."), aff'd , No. 15-1118, 2016 WL 299007 (C.D. Ill. 2016) ; In re Marston , 417 B.R. 766, 770 (Bankr. N.D. Ill. 2009) ("Thus, under 11 U.S.C. § 541, the trustee of a bankrupt debtor may bring any cause of action that the debtor could have brought under state law as of the commencement of the case."). This is important because, as seen below, if the trustee's only basis for disregarding Zig Zag Corporation's corporate form is section 541(a)(1) and the Debtor's right to do *758 so, then his alter ego claim will fail as regards Zig Zag. See In re Rehab. of Centaur Ins. Co. , 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015, 1018-19 (1994) (repudiating the notion that under Illinois law the corporate form may be disregarded at the behest of the corporation or its shareholder(s); noting that the right to do so under Illinois law belongs to third-party creditors (which would include the bankruptcy trustee when the trustee is imbued with creditor status and not merely debtor-derivative status under the Bankruptcy Code) ).
Third, section 544(b) allows the trustee to assert any state law avoidance action that is exercisable or that could have been exercised by a creditor holding an allowable unsecured claim. See 11 U.S.C. § 544(b). Under section 544(b), the trustee's rights are derivative not of the debtor, but rather of the debtor's creditors. Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc. , 885 F.2d 1149, 1155 (3d Cir. 1989) ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf."). If those creditors would succeed under state law on the avoidance cause of action, so may the trustee.
Fourth, section 544 authorizes the trustee to assert any cause of action based on a general injury to the debtor's creditors; that is, the trustee may assert a cause of action derivatively of creditors' rights to do so if the allegations "could be asserted by any creditor." See Fisher v. Apostolou , 155 F.3d 876, 879 (7th Cir. 1998) (quoting Koch Refining v. Farmers Union Central Exchange, Inc. , 831 F.2d 1339, 1348 (7th Cir. 1987) ).
If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim....
A trustee may maintain only a general claim. His right to bring a claim depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to specific creditors.
Id. at 879-880 (quoting Koch , 831 F.2d at 1348-49 ).
A claim is personal and not general where "the claimant is harmed and no other claimant or creditor has an interest in the cause." Id. at 879. Thus, if a creditor claim is not personal, it may be brought by the trustee for the benefit of the entire creditor body.
This fourth basis of trustee authority has been strongly criticized. See In re Greater Southeast. Cmty. Hosp. Corp. , 333 B.R. 506, 517-21 (Bankr. D.D.C. 2005) ; In re Miller , 197 B.R. 810, 814-15 (W.D.N.C. 1996). The courts in both Greater Southeast and Miller opined that the Seventh Circuit's decision in Steinberg v. Buczynski[20] effectively overruled Koch Refining's holding that claims belonging to creditors generally may be brought by the trustee in bankruptcy. Greater Southeast , 333 B.R. at 519 ; Miller , 197 B.R. at 813 n.4.
Nevertheless, because the holding and reasoning of Koch Refining was cited and quoted with approval both in Apostolou and more recently in In re Teknek, LLC ,[21] this court will apply it in this case. This point is important because the trustee's abstract legal ability to recover the allegedly fraudulent transfers in this case depends on his ability to treat Zig Zag Corporation as the alter ego of Michael Wolf under Illinois law at the time of the *759 transfers from Zig Zag Corporation to ZZC. Illinois law apparently does not allow the corporate form to be disregarded by a shareholder of the corporation;[22] thus, if the trustee's right to disregard Zig Zag's corporate form is derivative only of the Debtor-shareholder's right to do so under Illinois law based on section 541(a)(1), the trustee must lose. See, e.g. , In re Howland , 579 B.R. 411, 416-17 (E.D. Ky. 2016) (noting the distinction between asserting a reverse-piercing or alter ego claim based on the rights of the debtor under section 541 and asserting such a claim based on the rights of creditors under section 544 ).
If, on the other hand, he can step into the shoes of Michael Wolf's general creditors under section 544 and the rationale of Koch Refining , he may disregard the corporate form of Zig Zag Corporation under Illinois law based on the creditors ' right to do so and thus treat Zig Zag's property as Michael Wolf's for the purposes of asserting fraudulent transfer Counts V-IX and recovering the value of the MMQB business.[23]
IV. The Complaint - Factual Background
The court now turns to the well-pleaded allegations in the complaint, which are central to the analysis, and which it will describe largely in its original order to the extent possible. The story generally is one of a web of artificial legal entities, all alleged to have been used as part of an elaborate scheme to defraud Michael Wolf's creditors, most prominently his then-wife Elizabeth Wolf, by transferring the family business out of a corporation owned and controlled by Michael Wolf to an entity (or entities) owned and controlled by his sons, most prominently Scott Wolf. According to the allegations in the complaint, the family business was transferred from an entity known as Zig Zag to one by the name of ZZC and then ultimately came to rest in an entity known as MMQB, Inc.
*760 (owned and controlled by Scott Wolf), with the proceeds of the business then being funneled to various persons, including the Debtor, through the use of other, separate corporate entities. The court first begins with a general description of the parties, and then it moves into the narrative provided by the complaint.
Michael, Scott, and Peter Wolf all allegedly reside with one another in Washington state. Trustee's Amended Complaint, Docket No. 95, at ¶¶ 15-17. Zig Zag is an Illinois corporation incorporated in 1987, and at all relevant times Zig Zag was 100% owned by Michael Wolf (the Debtor). Id. at ¶ 18.
Illinois ZZC, Inc. (ZZC IL) "is an Illinois corporation incorporated on December of 2011." Id. at ¶ 19. It was 100% owned by Michael Wolf during the relevant time periods in this case. Id. Delaware ZZC, Inc. (ZZC DE) "is a Delaware corporation also incorporated in December of 2011." Id. at ¶ 20. It was also 100% owned by Michael Wolf during the relevant time periods in this case. Id.
MMQB, Inc. "is a Delaware corporation incorporated in 2014." Id. at ¶ 21. Scott Wolf, not Michael, was and is the sole officer, director, and shareholder. Id.
Hound Ventures, Inc. (Hound Ventures) is also a Delaware corporation, having been incorporated in 2014 (shortly after MMQB, Inc.).Id. at ¶ 22. Scott Wolf is also the sole officer, director, and shareholder of this corporation. Id.
SHBM, Inc. (SHBM) "is a Delaware corporation incorporated in 2009." Id. at ¶ 23. This corporation is also solely owned and managed by Scott Wolf. Id.
Melissa Skolnick[24] is Scott Wolf's girlfriend and allegedly resides with Scott Wolf in Washington state. Id. at ¶ 24. Melissa Skolnick received, in 2014, $250,000 or more (all attributable to the MMQB business) from an entity called "Four Legs, Inc." (Four Legs), a Delaware corporation incorporated in 2010. Id. at ¶ 25.
Finally, Ma Cherie LLC (Ma Cherie) is a business entity organized under the laws of Montana in 2014. Id. at ¶ 26. It was formed by Michael and Scott Wolf "in order to purchase a custom Aston Martin owned by the Debtor." Id. Scott Wolf is the sole member of Ma Cherie, and the entity's existence has been based entirely around the Aston Martin. Id.
As alleged, this adversary proceeding primarily concerns Michael Wolf's (the Debtor) fraudulent transfer of a business prior to the petition date to his sons, Scott and Peter Wolf. Id. at ¶ 1. "The purpose of the transfer was to remove the Debtor's interest in the business from the reach of his creditors including, but not limited to, his wife, in anticipation of their impending divorce." Id.
This business is a "trade publication for the commercial furniture industry," named the Monday Morning Quarterback (MMQB), published by facsimile, e-mail, and the internet to varying degrees as technology advanced. Id. at ¶ 2. Michael Wolf started MMQB in the 1980s. Id. at ¶¶ 27-29. From 1987 to 2011, the business's income was attributed to one of the Defendants, Zig Zag Corp. (Zig Zag), "an Illinois corporation wholly owned by the Debtor." Id. at ¶¶ 3, 18, 33-34. MMQB had income of over $1,000,000 by 2010-11. Id. at ¶¶ 3, 37.
Though the income belonged (at least for tax purposes) to Zig Zag, Michael Wolf used that income to pay his and his family's *761 personal creditors hundreds of thousands of dollars, in addition to paying himself a "lavish salary," id. at ¶¶ 4, 35, and in addition to paying his sons a salary for work performed on behalf of the business, id. at ¶ 36. The expenses paid on behalf of his family included the Debtor's credit card bills as well as those of Elizabeth, Scott, and Peter Wolf. Id. at ¶ 38. This income was not reported on the Debtor's or his sons' tax returns. Id. at ¶ 39. The business remained very profitable and, up through late 2011, the entire Wolf family "benefitted handsomely from the income it generated." Id. at ¶ 5.
This changed in 2011 when Michael and Elizabeth Wolf's marriage "began to fall apart," with Michael Wolf moving out of the marital residence. Id. at ¶ 6. Around this time, Michael Wolf began taking action to transfer his interest in the MMQB business to others, the design being to prevent Elizabeth Wolf and other creditors from reaching it and its value. Id. at ¶¶ 7, 43-44.
Specifically and importantly, Michael Wolf caused the transfer of the MMQB business from his wholly owned and controlled entity (Zig Zag) to entities owned and/or controlled by Scott Wolf, including two defaulted Defendants in this proceeding, MMQB, Inc. (not to be confused with the underlying MMQB "business," which has allegedly changed hands between corporate entities multiple times) and Hound Ventures, Inc. Id. at ¶ 8. The Debtor still enjoys the fruits of MMQB's income, as it continues to fund his living and legal expenses. Id. at ¶ 9.
Michael Wolf and/or his sons created two entities named ZZC, one an Illinois Corporation and the other a Delaware Corporation. Id. at ¶¶ 45-46. In 2012, income from the MMQB business (presumably derived from accounts receivable owed on account of subscription agreements and/or advertising agreements) ceased being attributed to Zig Zag and began to be attributed to, and deposited into the accounts of, ZZC. Id. at ¶ 47. The court takes this to mean that there was an effective, if perhaps informal, assignment of Zig Zag's receivables (intangible rights to payment arising from the subscription/advertising agreements) to ZZC in 2012.
No consideration was ever received by Zig Zag for this transfer. Id. at ¶ 48. The Debtor, according to ZZC's 2012 tax return, owned 100% of the stock of ZZC. Id. at ¶ 49. The substance of the business did not change; Michael, Elizabeth, Scott, and Peter Wolf all continued to perform in their former roles. Id. at ¶ 50. Just as with Zig Zag, Michael Wolf disregarded the corporate formalities and used ZZC's income to pay his and his family's personal creditors. Id. at ¶ 51.
As discussed above, Michael and Elizabeth's marriage began breaking down in 2011. On December 5, 2013, Elizabeth Wolf filed a petition for divorce in Lake County, Illinois. Id. at ¶ 52. Shortly thereafter, ZZC's Board of Directors (Michael and Scott) fired Elizabeth from ZZC (she had previously handled advertising for the business). Id. at ¶ 54. Michael Wolf was then also tired by ZZC, id. at ¶ 55-56, in an attempt to make it appear as though he had no income to pay to Elizabeth Wolf for temporary support and maintenance, id. at ¶ 55-57. Around that time, Michael Wolf also issued a promissory note to ZZC in the amount of $128,781.73. Id. at ¶ 58.
As noted above, the Debtor claimed to own 100% of ZZC's stock on his 2012 tax return. During the divorce proceedings, and in his bankruptcy schedules (and in testimony to the bankruptcy court), he claimed, however, to own only 49% of ZZC's shares, the other 51% belonging to Scott Wolf. Id. at ¶ 60-61. To the court, *762 one of four plausible things may have happened. Scott Wolf could have owned 51% of the stock from the beginning, and Michael lied on his tax return. Second, Michael could still own 100% of ZZC, and he simply lied to the family court and to the bankruptcy court. Third, Michael could have transferred 51% of the stock to Scott at sometime between 2012 and the date that he filed his bankruptcy petition. Fourth, Michael (and/or Scott) could have caused ZZC to issue new shares to Scott such that Scott would own 51% of the company. Scott Wolf, at any rate, never paid anything for his interest in the company, to the extent that he in fact does have an interest in the company. Id. at ¶ 63. Moreover, the income of the business, regardless of ownership, continued to go to Michael Wolf either directly or indirectly, such as when ZZC paid for Michael Wolf's apartment in Chicago. Id. at ¶ 65-66.
In January of 2014, around the time of the divorce petition, Michael and/or his sons formed and incorporated MMQB, Inc. Id. at ¶¶ 67-68. Scott Wolf is listed as the sole director of MMQB, Inc., and Scott Wolf has claimed that he elected himself as all of the officers of MMQB, Inc. Id. at ¶¶ 69-70. Scott Wolf owns all of the shares of MMQB, Inc., which he purchased for $7.51. Id. at ¶ 71. Around January of 2014, ZZC transferred its receivables to MMQB, Inc. Id. at ¶ 73. No purchase agreement exists for either the assets of ZZC or its stock. Id. at ¶¶ 74-75.
The Wolf's incorporated another entity in February of 2014: "Hound Ventures." Id. at ¶ 77. Scott Wolf claims to be the sole director, officer, and shareholder of the entity. Id. at ¶ 78. Peter Wolf claims to be an employee of Hound and receives a salary many times larger than that which he received at Zig Zag or ZZC. Id. at ¶¶ 80-81. Nominally at least, Hound Ventures has provided services to MMQB, Inc., for which it has received hundreds of thousands of dollars in compensation from MMQB, Inc. Id. at ¶¶ 82-84. The facts alleged, such as that MMQB, Inc. had an "infinite amount of time" to pay Hound Ventures, tend to show that this arrangement did not reflect the economic substance of the two entities' commercial relationship with one another (i.e. , MMQB, Inc. was funneling money to Hound Ventures). Id. at ¶¶ 84-89. In 2014, MMQB, Inc. transferred approximately $300,000 of income attributable to the underlying MMQB business to Hound Ventures. Id. at ¶ 90. Part of that money went to Scott Wolf. Id. at ¶¶ 91-92. MMQB, Inc. was Hound Ventures' sole source of income. Id. at ¶ 93.
Going back in time, Michael Wolf and his sons incorporated another entity in September of 2009: "SHBM." Id. at ¶¶ 94-95. Scott Wolf is allegedly the sole director, officer, shareholder, and employee of SHBM. Id. at ¶ 96. Much in the same fashion as with Hound Ventures, Scott Wolf arranged for MMQB, Inc., to pay SHBM "whatever was necessary to be charged" in order to publish the MMQB publication, and through such arrangement caused the transfer of hundreds of thousands of dollars from MMQB, Inc. to SHBM, which was then largely transferred to Scott Wolf's girlfriend, Melissa Skolnick. Id. at ¶¶ 98-104. These transfers to Melissa Skolnick were carried out through an intermediary entity known as "Four Legs." Id. at ¶¶ 105-112.
During the divorce proceedings, Michael Wolf was ordered to sell his Aston Martin to pay Elizabeth Wolf's attorneys' fees. Id. at ¶ 115. Scott Wolf created an entity, "Ma Cherie," which then purchased the car and in turn sold it to a car-dealership and then re-purchased it from the same. Id. at ¶¶ 116-121. Michael Wolf never turned over the proceeds of the sale and was held *763 in contempt by the family court. Id. at ¶¶ 123-124. Michael Wolf then filed for bankruptcy rather than face jailing for his contempt. Id. at ¶¶ 124-126.
As of the filing of the bankruptcy, The Debtor owed and owes the IRS, credit card companies, and Elizabeth Wolf over $ 1,000,000, and the largest creditor is Elizabeth Wolf.[25] Id. at ¶ 127. During the bankruptcy, Michael Wolf hindered the trustee's attempts to sell the marital home by disseminating and publishing defamatory, derogatory, and threatening e-mails and flyers. Id. at ¶ 132.
Michael Wolf's sons and/or the entities described above have provided Michael Wolf with funds to pay for legal expenses, for which Michael has created and signed promissory notes. Id. at ¶¶ 133-37. Those funds are attributable to the MMQB publication/business. Id. at ¶¶ 138-40.
With the complaint's general allegations having been laid out, the court now turns to the legal sufficiency of those allegations. Do they, in conjunction with the specifically pleaded material in each count, suffice to support the entry of default judgments against the named Defendants?
V. The Rule 9(b) Arguments
The Wolf's make arguments premised on Civil Rule 9(b), which generally requires fraud to be pleaded with particularity. As a default judgment may only be entered based upon well-pleaded facts, it stands to reason that a judgment may not be entered upon a fraud-based count if the pleading runs afoul of Rule 9(b).
In the context of fraudulent transfers, the Rule applies to constructive and actual fraud. In re Glick , 568 B.R. 634, 657 (Bankr. N.D. Ill. 2017) (citing General Elec. Capital Corp. v. Lease Resolution Corp. , 128 F.3d 1074, 1079 (7th Cir. 1997) ).
To plead an actual or constructive fraud with the necessary particularity, the complaint must allege what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances.
Glick , 568 B.R. at 657 (internal quotations omitted).
It is to be remembered that the rule is relaxed where a bankruptcy trustee is the plaintiff. Allegaert v. Perot , 78 F.R.D. 427, 430 (S.D.N.Y. 1978) ; In re DBSI, Inc. , 445 B.R. 351, 355 (Bankr. D. Del. 2011) ; In re Hearthside Baking Co., Inc. , 402 B.R. 233, 255 (Bankr. N.D. Ill, 2009) ; In re 1031 Tax Grp., LLC , 420 B.R. 178, 190-91 (Bankr. S.D.N.Y. 2009). The same is true where specific information is peculiarly within the adverse parties' knowledge. In re Potter , 88 B.R. 843, 847 (Bankr. N.D. Ill. 1988) ; In re First Merchants Acceptance Corp. Sec. Litig. , No. 97 C 2715, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998).
Here, the plaintiff is a bankruptcy trustee, asserting claims based on violations of third parties' legal rights (rights either of the Debtor or of his creditors). Also, all of the alleged transfers took place between family members and those family members' closely held corporations (thus indicating that specific knowledge regarding the particulars of the transfers would neither be generally known nor readily discoverable by outsiders). Those defendants' lack of cooperation in discovery has been at the heart of these proceedings. Thus, the court will not strain to apply Rule 9(b) rigorously against the trustee.
*764 With those qualifications in mind, Rule 9(b) is met in this case. There are essentially three transfers alleged. First, there is the allegation that the MMQB business was transferred from Zig Zag Corporation to ZZC at a time when both corporations were wholly owned by the Debtor. The MMQB business has been described in the complaint in some detail. This transfer was allegedly made sometime in early 2012. Again, it was made by Zig Zag corporation to ZZC. The circumstances, as alleged, were essentially that the Debtor was attempting to transfer assets between corporations so as to shield them from his then-wife, Elizabeth.
Second, there is the allegation that 51% of the stock in ZZC was transferred by Michael to Scott Wolf no earlier than in 2013, at a time when ZZC still held the MMQB business. The circumstances are the same as for the transfer from Zig Zag Corporation to ZZC (attempting to shield property from the Debtor's then-wife Elizabeth).
Third, the trustee alleges that the MMQB business was transferred from ZZC to MMQB, Inc. roughly in January of 2014. At that time, as alleged, Scott Wolf owned 51% of ZZC and 100% of MMQB, Inc. The circumstances surrounding the transfer were the same: Michael and Scott Wolf were attempting to prevent the business from falling into the hands of Elizabeth.
Finally, and apart from the main transfers of the business itself, there is the multitude of secondary "income" transfers detailed in the complaint. These transfers of income through closely held corporations were, according to the complaint, made in order to allow Michael and Scott Wolf to clandestinely enjoy the fruits of the business.
The complaint alleges fraud with the requisite particularity. The Wolfs' argument to the contrary is rejected.
VI. The Legal Theories
a. Count I: Alter Ego / Reverse-Piercing
The first count is for declaratory relief. It asks for the court to declare that the assets and income of the "Monday Morning Quarterback" (the business) are property of the estate, no matter which legal personality actually owns the assets of the business, because maintaining the fiction of separate legal personalities for the "sham corporations" described above would sanction a fraud and promote injustice.
Based on a review of the balance of the complaint, the court takes this count to be asking for relief in the form of treating the entity-Defendants as the alter egos of Michael Wolf, and thus disregarding their separate existence apart from him, for the purposes of asserting the substantive legal theories to follow in the complaint (including turnover, constructive/resulting trust, and fraudulent transfer theories); it does not take this count to be asking to hold those entity-Defendants vicariously liable for Michael Wolf's (or the estate's) debts, such as, for example, Michael Wolf's (or the estate's) credit card debt, tax debt, or any debt owed to Elizabeth Wolf. The court finds that the allegations establish that Zig Zag may properly be treated as Michael Wolf's alter ego under Illinois law for the purposes of asserting the substantive legal theories found in the complaint.
State law, pertinently both Illinois and Delaware law,[26] governs the trustee's alter ego theory. This is because the source of *765 substantive law for the trustee's request must, by definition, be either state or federal law, cf. Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc. , 212 F.3d 1031, 1038 (7th Cir. 2000) (noting that the source of law must, by definition, be either state or federal), and the trustee has not asserted any substantive consolidation theory under substantive federal bankruptcy law, see In re Owens Corning , 419 F.3d 195, 205 (3d Cir. 2005) ; In re Clark , 692 F. App'x 946, 948 (9th Cir. 2017) (noting that substantive federal law governs a substantive consolidation request).[27]
As a general and fundamental principle, corporations and other artificial legal entities enjoy a legal personality separate and distinct from that of the equity owners; if an individual owns even all of the shares of a corporation, that individual does not , without more, have an interest in the property owned by the corporation. See, e.g. , Dole Food Co. v. Patrickson , 538 U.S. 468, 474-75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) ; Bird v. Wilmington Soc. of Fine Arts , 43 A.2d 476, 483 (Del. 1945) ; Bevelheimer v. Gierach , 33 Ill.App.3d 988, 339 N.E.2d 299, 303 (1975). Under state law, in exceptional circumstances this rule may be disregarded "where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." Bevelheimer , 339 N.E.2d at 303. This is sometimes known as veil-piercing. See Int'l Fin. Serv's. Corp. v. Chromas Techs. Canada, Inc. , 356 F.3d 731, 736 (7th Cir. 2004).
There is, however, a substantive legal distinction between veil-piercing and what is known as the "alter-ego rule," the latter of which is "the doctrine that shareholders will be treated as the owners of a corporation's property , or as the real parties in interest, whenever it is necessary to do so to prevent fraud, illegality, or injustice." See Alter-Ego Rule , BLACK'S LAW DICTIONARY 94 (10th ed. 2014) (emphasis added). As the Seventh Circuit has noted, "[e]fforts to pierce the corporate veil ask a court to hold A vicariously liable for B's debt .... But a contention that A is B's 'alter ego' asserts that A and B are the same entity ...." Elite Erectors, Inc. , 212 F.3d at 1038 (emphasis added).
The court begins first with Zig Zag, an Illinois corporation (so Illinois law applies). Van Dorn Co. v. Future Chem. & Oil Corp. , 753 F.2d 565, 570 (7th Cir. 1985) ; cf. Stromberg Metal Works. Inc. v. Press Mech., Inc. , 77 F.3d 928, 933 (7th Cir. 1996) (noting that the substantive law of the state of incorporation governs a veil-piercing case). Illinois courts have noted that "a corporation with only one stockholder will be treated as his alter ego. In such cases, the courts will deal with the substance of the transaction involved as if the corporate agency did not exist ," People ex rel. Hartigan v. Org. Servs. Corp. , 147 Ill.App.3d 826, 101 Ill.Dec. 273, 498 N.E.2d 597, 600 (1986) (emphasis added), at least where the corporate fiction has been "used as a protection to fraud or other illegal transactions," Chicago-Crawford Currency Exch., Inc. v. Thillens, Inc. , 48 Ill.App.2d 366, 199 N.E.2d 295, 299 (1964) ; see also Illinois Interior Finish Co. v. Poenie , 277 Ill. App. 554, 566 (1934). "[I]f the ... corporation is merely a dummy or sham, the distinct corporate entity will be disregarded and the [shareholder and corporation]
*766 will be treated as one ." Dregne v. Five Cent Cab Co. , 381 Ill. 594, 46 N.E.2d 386, 391 (1943) (emphasis added).
Importantly, however, the corporate form cannot be disregarded for the benefit of a shareholder. See In re Rehabilitation of Centaur Ins. Co. , 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015, 1018 (1994) ("[T]he general law mandates that the piercing of a corporate veil must never be made for the benefit of the corporation or its shareholders.") (internal quotations and citations omitted) (emphasis added). There is no similar prohibition on disregarding the corporate form at the behest of third-party creditors, however. See id. , 198 Ill.Dec. 404, 632 N.E.2d at 1018 (noting that the corporate form is properly disregarded in order to remedy fraud practiced upon third-parties). In other words, under Illinois law, a corporation cannot disregard its own corporate form to reach shareholder assets, and the same logic works in reverse: a shareholder cannot disregard the corporate form of the shareholder's own corporation to reach the corporation's assets.
It is therefore vital in this case to examine into whose shoes the trustee is stepping to assert the alter ego or reverse veil-piercing claim under state law. For example, in In re Howland , the court was considering the same problem, namely whether the trustee of an individual equity owner's bankruptcy estate could avoid and recover a fraudulent transfer made by that individual's wholly owned LLC. In re Howland , 579 B.R. 411 (E.D. Ky. 2016). It framed the issue as one of reverse-piercing, an issue on which it noted courts are "deeply split." Id. at 416 (quoting In re ALT Hotel, LLC , 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012) ).
There are two recognized types of reverse veil piercing-insider and outsider. Insider reverse veil piercing allows a shareholder to disregard the corporation of which he is a part for his own benefit. On the other hand, outsider veil piercing occurs where a third-party creditor seeks to reach the assets of a corporation to satisfy the debts of a corporate insider.
In this matter, the Trustee could potentially use both insider and outsider reverse piercing, each of which are dependent on Kentucky law. First, the Trustee stands in the shoes of the Debtors, assuming any causes of action belonging to them. In this position, the Trustee can pursue an insider reverse piercing approach if it is allowed under Kentucky law. Butner v. United States , 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Whether a particular cause of action is available to the debtor, and thus constitutes 'property of the estate,' is determined by state law."). Furthermore, under § 544, the Trustee also stands in the shoes of the Debtors' judgment creditors and may bring claims available to them. If Kentucky law allows such creditors to use outsider reverse piercing, then the Trustee may also use that approach. 11 U.S.C. § 544. Since Kentucky has not adopted or rejected reverse veil piercing generally, this distinction is not vital to the Court's decision, but it is helpful to note in order to interpret the statements of Kentucky courts regarding reverse veil piercing.
Id. at 416-17 (some internal citations omitted).
Unlike Kentucky law, and as indicated in the discussion above, there is a clear distinction in Illinois between "insider" alter ego claims and "outsider" alter ego claims. The former are seemingly impermissible, while the latter may be permissible. As the court in Howland noted, however, the trustee can use section 544 to make out an *767 "outsider" alter ego or revere-piercing claim. And as indicated in Part III.b. above, this court does not believe that the state of the law in the Seventh Circuit forbids this approach to trustee standing/authority using section 544. There is nothing to indicate that Michael Wolf's alleged misuse and abuse of the corporate form to engage in fraudulent transfers with actual intent to hinder, delay, and defraud his creditors would have, if true, resulted in anything but a general injury to all of his creditors, not a special or specific injury to any particular creditor or class of creditors. See Apostolou , 155 F.3d at 879-880 (quoting Koch , 831 F.2d at 1348-49 ).
With the corporate form capable of being disregarded under Illinois law by the trustee standing in the shoes of the creditors of Michael Wolf, the only question is whether it may be disregarded in this case and, if so, disregarded in the manner in which the trustee seeks to disregard it.
The alter-ego rule as the trustee seeks to apply it, i.e. , not to impose vicarious personal liability but rather to treat the assets of one legal personality as the assets of another at a given point in time, has found application in bankruptcy cases similar to the one at bar. For example, in In re Fisher ,[28] an unpublished decision from the Sixth Circuit, the court had to consider the same question as that faced by the court here.
In Fisher , the debtor was the sole shareholder of a closely held corporation. Fisher , 296 F. App'x at 497. The corporation owned inventory. Id. at 498. Prior to the petition, the debtor caused the corporation to transfer its inventory to the debtor's girlfriend, who then sold it on for a much higher price to a third-party. Id. at 497-98. The bankruptcy court, relying on an alter-ego theory under Ohio law, avoided the transfer from the debtor's closely held corporation to the debtor's girlfriend under section 548 of the Code. Id. at 499. The defendants-appellants argued that the bankruptcy court had impermissibly reverse-pierced the corporate veil in avoiding the transfer, since Ohio law did not recognize reverse-piercing, and the bankruptcy court could not have found that the transfer of the inventory was a transfer of an interest of the debtor in property without having first reverse-pierced the veil of the debtor's wholly owned corporation, which actually had owned the inventory transferred. See id. at 506. As noted by the Sixth Circuit, relying on one of its own prior cases, which in turn had relied on the Seventh Circuit's Elite Erectors case,
[t]his court, has explained, however, that veil piercing and alter ego concepts are distinct. The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct. Here, the bankruptcy court found that because [the debtor] and [the corporation] were the same entity, [the corporation's] inventory belonged to [the debtor] such that the transfer to [the debtor's girlfriend] was a transfer of an interest in property of the debtor.
Id. (emphasis in original) (internal citations omitted).
In applying the alter ego doctrine as articulated by it above, the court relied on a statement of substantive Ohio law that "where the stock of a corporation is owned entirely by one party , and the party in interest is the stockholder, the fiction of the separate entity of the corporation may be disregarded where the ends of justice require it." Fisher , 296 F. App'x at 505-06 (quoting *768 Knight v. Burns , 22 Ohio App. 482, 154 N.E. 345, 346 (1926) ) (emphasis added).
The Sixth Circuit then affirmed the bankruptcy court's decision that the corporation was merely the debtor's alter ego under Ohio law and that it therefore did not enjoy a legal personality separate and distinct from that of the debtor. Id. at 507 ("Nor are we persuaded that the bankruptcy court erred in finding that [the corporation] was [the debtor's] alter ego .") (emphasis in original). As such, the bankruptcy court had properly concluded that the transfer of corporate inventory had been a transfer of an interest of the debtor-shareholder in property.
Because of the uncertainty in the law in this area, and because this is an area of state and not federal law, this court will attempt to hew closely to the approach taken by the court in Fisher , even though it is an unpublished decision, since the decision in Fisher is the only decision of a federal Court of Appeals (that this court has found) at least tacitly approving the use of the alter ego doctrine in the manner in which the trustee seeks to use it in this case.
There, again, the court focused on substantive state law allowing the corporate form to simply be disregarded (in reverse) where the stock of the corporation was owned entirely by one person. Then, it applied the alter ego concept as that concept had been articulated in the Seventh Circuit's Elite Erectors case to treat the transfer of corporate property as the transfer of an interest of the debtor in property.
As far as substantive state law is concerned, the statement of Ohio law that the court in Fisher relied on (see above) is nearly identical to statements of Illinois law in this area where the corporate form is being disregarded generally and not to impose vicarious personal liability on another legal personality, so adherence to the "wholly owned" approach in Fisher makes just as much sense under Illinois law in this case as it did under Ohio law in Fisher . See Fisher , 296 F. App'x at 505-06 (quoting Knight v. Burns , 22 Ohio App. 482, 154 N.E. 345, 346 (1926) ; Hartigan , 101 Ill.Dec. 273, 498 N.E.2d at 600 ("[A] corporation with only one stockholder will be treated as his alter ego. In such cases, the courts will deal with the substance of the transaction involved as if the corporate agency did not exist.") (emphasis added); Chicago-Crawford , 199 N.E.2d at 299 ("It has been frequently held that the owner of all of the stock of a corporation will be treated as its alter ego, and these cases have refuted the fiction of separate legal entities in cases where used as a protection to fraud or other illegal transactions.") (emphasis added).
This court will therefore limit the application of the alter ego doctrine to corporations where the Debtor, Michael Wolf, owned 100% of the stock in the corporation during the relevant time-periods. With respect to those corporations, then, any transfers of their property may be treated as transfers of the Debtor's property prior to the bankruptcy filing under the alter ego doctrine as articulated by the courts in Fisher and Elite Erectors .
The court begins first with Zig Zag. Under Illinois law, the decision as to whether to collapse two legal personalities into one pursuant to the alter ego doctrine is left to the discretion of the trial court. See In re Kreisler , 331 B.R. 364, 379 (Bankr. N.D. Ill. 2005), aff'd , 352 B.R. 671 (N.D. Ill. 2006), rev'd and remanded on other grounds , 546 F.3d 863 (7th Cir. 2008).
Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of *769 another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.
Main Bank of Chicago v. Baker , 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981).
Here, again, the court, in applying the alter ego doctrine, finds it crucial that Michael Wolf was Zig Zag's sole shareholder at all relevant times. See Dep't of Transp. v. Heritage-Pullman Bank Tr. Co. , 826, 254 Ill.App.3d 823, 194 Ill.Dec. 75, 627 N.E.2d 191, 193 (1993) ; Hartigan , 101 Ill.Dec. 273, 498 N.E.2d at 600 ; cf. Fisher , 296 F. App'x at 505-06 (relying on a nearly identical statement of Ohio alter ego law requiring the stock of the entity to be solely owned by one person). An application of the traditional factors for determining when to disregard a separate legal personality is appropriate as well, however. See Fisher , 296 F. App'x at 506 (considering the traditional factors in determining whether the disregard of the corporate form was appropriate); see also Melko v. Dionisio , 219 Ill.App.3d 1048, 162 Ill.Dec. 623, 580 N.E.2d 586, 595 (1991) ("[T]he mere allegation that he was a dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate existence.").
Here, of the many factors able to be considered, the court finds that the allegations establish that Michael Wolf failed to observe corporate formalities and commingled funds by paying personal and family expenses (such as personal and family credit card debts) directly with corporate funds, diverted assets from Zig Zag to a closely related entity (ZZC) to the detriment of creditors, and, in transferring the MMQB business assets for no consideration to ZZC, failed to maintain arms-length relationships among related entities. Bank of Am. v. WS Mgmt., Inc. , 392 Ill.Dec. 895, 33 N.E.3d 696, 727 (2015) (listing the factors to be considered). Also, the fact that Michael Wolf, as alleged, continues to run the MMQB business and continues to receive income from it, along with the fact that he built and ran the business for nearly three decades, points to Zig Zag having been used as a mere façade for the operation of its sole stockholder, Michael Wolf. See id.
Thus, because Michael Wolf was Zig Zag's sole stockholder, because funds were commingled and used for personal expenses, because Zig Zag's business assets were diverted to related entities for no consideration, and because Michael Wolf is the dominant personality behind the MMQB business originally held by Zig Zag, there is such unity and interest of ownership that Zig Zag and Michael Wolf should be treated as the same legal personality.
The allegations, taken as true, also show that Zig Zag's assets (the MMQB business) were drained from Zig Zag for no consideration and as part of an actually fraudulent scheme to hinder Michael Wolf's creditors. See Chicago-Crawford , 199 N.E.2d at 299. Thus, as alleged, it can be seen that the sole stockholder (Michael Wolf) has used Zig Zag to promote fraud by draining its assets in an intentional attempt to prevent his creditors from reaching the value of the business, and thus the separate personality of Zig Zag should be disregarded. See Main Bank , 56 Ill.Dec. 14, 427 N.E.2d at 101 (noting that, in order to disregard the separate corporate personality, the personality must have been used to sanction a fraud or promote an injustice).
Zig Zag will therefore be treated as the alter ego of Michael Wolf; the two will, for *770 the rest of the analysis, be treated as having had the same legal personality during the period of time over which the corporation was used to further Michael Wolf's allegedly fraudulent scheme.
What about the rest of the entities? Due to the strong resemblance of the alter ego doctrine as used in this case to reverse veil-piercing, see In re Teleservices Grp., Inc. , 469 B.R. 713, 728 n.45 (Bankr. W.D. Mich. 2012) (questioning the distinction between the two concepts drawn by the court in Fisher and suggesting that the court in Fisher was really substantively consolidating the debtor and the closely held corporation under substantive federal bankruptcy law, not substantive Ohio law, in order to reach the result that the corporation's transfer of its inventory was a transfer of an interest of the debtor in property), and due to the highly uncertain nature of state law in this area, see In re Glick , 568 B.R. 634, 661-64 (Bankr. N.D. Ill. 2017) (discussing both Illinois and Delaware law), the court will respect their separate existence. See Glick , 568 B.R. at 664 (noting that where state law is unclear, federal courts should adopt an interpretation of state law that restricts liability rather than expands it); In re Duckworth , No. 10-83603, 2012 WL 4434681, at *8 (Bankr. C.D. Ill. Sept. 24, 2012) (noting that extreme caution in this area is warranted).
The allegations regarding ZZC, for instance, are not clear on whether the ZZC that allegedly received the MMQB business was the Illinois or the Delaware ZZC. Moreover, by the time the business was allegedly fraudulently transferred from ZZC, Michael Wolf was only a 49% shareholder in the corporation. For MMQB, Inc. and the rest of the entities named in the complaint, Michael Wolf has never owned any of the stock in those companies. While this fact might not hold as much water in a traditional veil-piercing case, this court has chosen to take a conservative approach in light of the uncertainty in state law in this area and to respect the separate existence of the corporate entities named in the complaint except where the allegations clearly show that Michael Wolf was the sole shareholder of the entity during the relevant time-periods, including, most importantly, during the time when the MMQB business was allegedly fraudulently transferred out of the entity.
b. Count II: Turnover
The trustee, in Count II, asks for turnover of the MMQB business. As alleged in the complaint, however, the MMQB business has been transferred to MMQB, Inc., and the income of the business is being funneled through several other entities. If the Debtor (personally) or Zig Zag (the Debtor's alter ego) owned the property comprising the MMQB business (including its equipment, any inventory, any intellectual property, any goodwill, and any receivables) as of the petition date, then turnover under section 542 might be appropriate. See In re Roti , 271 B.R. 281, 291-92 (Bankr. N.D. Ill. 2002), aff'd sub nom. Nelmark v. Helms , No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003).
As it stands, however, the business components have allegedly been transferred to various third-party entities, including MMQB. Inc., in a scheme to defraud Michael Wolf's creditors, and all of this happened pre-petition. The alleged ultimate transferee of the business, namely MMQB, Inc., is not being treated by this court as the alter ego of the Debtor, Michael Wolf, nor are any other entities other than Zig Zag. On these alleged facts, the MMQB business (or its value) cannot be recovered by the trustee from any of the defaulted Defendants based on this count as a matter of law. See *771 Bank of America v. Veluchamy (In re Veluchamy) , 879 F.3d 808, 816 (7th Cir. 2018) (noting that a turnover action cannot be used where the property in question was transferred to someone else prior to the petition date; also noting that a turnover action "generally cannot substitute for a fraudulent-transfer action"). No default judgment will be entered based on this count.
c. Count III: Constructive Trust
In Count III, the trustee asks the court to hold that the MMQB business is being held in trust in favor of the trustee for the benefit of the estate (creditors). The trustee, in the allegations, alleges that property (the MMQB business) was transferred, causing the transferees to become unjustly enriched in fraud of Michael Wolf's creditors' rights as creditors.
First, to the extent this count merely seeks the imposition of a constructive trust as a remedy , it cannot be set out in a separate count because it is not an independent cause of action. See Arvest Bank v. Byrd , 814 F.Supp.2d 775, 798 n.7 (W.D. Tenn. 2011) ; Goldstein v. F.D.I.C. , No. CIV.A. ELH-11-1604, 2012 WL 1819284, at *12 (D. Md. May 16, 2012). Accordingly, no default judgment may be entered on the count; if the constructive trust is being requested as a remedy under the UFTA, the merits of that request can be considered under the trustee's UFTA counts (considered in the context of section 544(b) and section 550 ).
If the count is attempting to invoke substantive principles of fraud and unjust enrichment independently of any statutory cause of action for the conduct described in the count (transferring the business in fraud of creditors' rights and causing the transferees to thereby become unjustly enriched), the count still may not serve as a basis for default judgment as a matter of law.
First, if the trustee is attempting to assert the cause of action under section 541(a)(1), he can only succeed if Michael Wolf could have succeeded. Bank of Marin v. England , 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966) ; Zartman v. First Nat. Bank of Waterloo , 216 U.S. 134, 135, 30 S.Ct. 368, 54 L.Ed. 418 (1910) ; Peterson v. McGladrey & Pullen, LLP , 676 F.3d 594, 596 (7th Cir. 2012) ; In re Graham Square, Inc. , 126 F.3d 823, 831 (6th Cir. 1997) ; Matter of Sanders , 969 F.2d 591, 593 (7th Cir. 1992) ; In re Cent. Illinois Energy Coop. , 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("A trustee's rights under section 541 are derivative of those held by the debtor."), aff'd , No. 15-1118, 2016 WL 299007 (C.D. Ill. 2016) ; In re Marston , 417 B.R. 766, 770 (Bankr. N.D. Ill. 2009) ("Thus, under 11 U.S.C. § 541, the trustee of a bankrupt debtor may bring any cause of action that the debtor could have brought under state law as of the commencement of the case."). Michael Wolf quite clearly could not have succeeded under Illinois law.[29]
Under Illinois law, Michael Wolf cannot petition a court of equity to impose a constructive trust in his favor over property *772 that he admittedly fraudulently conveyed. See Schultz v. Schultz , 274 Ill. 341, 113 N.E. 638, 641 (1916) ("If [the constructive trust claimant's] version is true he had the property deeded to [the transferee] in fraud of his creditors , and such action does not commend itself to a court of equity .") (emphasis added); Songer v. Partridge , 107 Ill. 529, 533 (1883) ("Where one person conveys property to another for the purpose and with the intent to defraud creditors, courts of equity will not aid such persons to regain the property thus fraudulently placed beyond control, but as a general rule courts of equity will leave parties to a fraudulent transaction in the position they have voluntarily placed themselves."); see also Illinois State Tr. Co. v. Jones , 351 Ill. 498, 184 N.E. 623, 627 (1933) ; Pratt v. Watson , 201 Ill.App.3d 56, 147 Ill.Dec. 280, 559 N.E.2d 280, 282 (1990). This is not so much the result of any affirmative defense that needed to be raised by the Defendants as it is the result of a built-in limitation on the assertion of the equitable ownership of an asset through the substantive constructive trust theory where the legal ownership of the asset has been divested in the first instance by way of the claimant's own admitted fraud. Since Michael Wolf would necessarily have failed on this count, so must the trustee.
To the extent the trustee is asserting creditors' rights under section 544 (perhaps generally or under section 544(b) as a quasi-avoidance action), he similarly must lose, but for different reasons. Simply put, creditors' remedy for a debtor's transfer of property in fraud of their rights as creditors lies under the fraudulent conveyance laws, here the Illinois UFTA.
A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.
Cohon v. Oscar L. Paris Co. , 17 Ill.App.2d 21, 149 N.E.2d 472, 476 (1958) (quoting Beatty v. Guggenheim Exploration Co. , 225 N.Y. 380, 122 N.E. 378, 380 (1919) ).
An application for constructive trust does not require the court to determine a priori what 'equity and good conscience' require in a particular case. Constructive trust is the principal device for vindicating equitable ownership against conflicting legal title; the rules by which equitable property rights are recognized are among the most predictable of equity jurisprudence.
RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 cmt. a (2011) (emphasis added).
A constructive trust is one raised by operation of law and imposed by a court exercising its equitable powers where the legal title to money or property was obtained by a person in violation of some duty owing to him who is equitably entitled to the money or property. A constructive trust may be used to compel a party who unfairly holds a property interest or money to convey that property or money to the one to whom it justly belongs where the person holding the property or money would be unjustly enriched if he were permitted to retain the property or money.
Volini v. Dubas , 245 Ill.App.3d 846, 184 Ill.Dec. 703, 613 N.E.2d 1295, 1303 (1993) (internal citations omitted).
A constructive trust is therefore appropriate as a remedial device if the claimant can establish that the defendant has legal title to property in which the claimant also has an equitable proprietary interest (equitable title to the property).
*773 See also Schwass By & Through Postillion v. Schwass , 126 Ill.App.3d 512, 81 Ill.Dec. 835, 467 N.E.2d 957, 960 (1984) (deciding whether to impose a constructive trust on insurance proceeds based on whether each claimant had been able to establish that they had an equitable interest in the proceeds). The claimant will have an equitable proprietary interest in the property capable of vindication by use of the constructive trust where the property in question has been acquired by way of
a transaction in which the defendant (i) has been unjustly enriched (ii) by acquiring legal title to specifically identifiable property (iii) at the expense of the claimant or in violation of the claimant's rights.
RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 cmt. a (2011); see also Emerson v. Maples (In re Mark Benskin & Co., Inc.) , 161 B.R. 644, 651-52 (Bankr. W.D. Tenn. 1993) (requiring "(1) a wrongful act; (2) specific property acquired by the wrongdoer which is traceable to the wrongful behavior; and (3) an equitable reason why the party holding the property should not be allowed to keep it").
Here, the trustee would have the court hold that at least some of the defaulted Defendants have been unjustly enriched by their receipt of legal title to the MMQB "business" (so really the components of the business - the goodwill, intellectual property, inventory, equipment, receivables (intangibles), bank accounts, cash, etc. - and the identifiable proceeds, products, or profits of those business components (actual received income) ) at the expense of the Michael Wolf's general creditors then-in-existence and/or in violation of those creditors' rights. These general creditors, according to the trustee, obtained an equitable proprietary interest in the business at the time of its fraudulent transfer[30] (since such a transfer would have been a fraudulent violation of their rights as creditors and would have resulted in the unjust enrichment of the transferee(s) ) and so should be able to obtain an order specifically compelling the current legal owner of the business to convey the business (and/or its identifiable proceeds) to their representative - the trustee in bankruptcy (unless the current legal owner is a bona fide purchaser of the business or any identifiable proceeds thereof).
The Illinois Supreme Court, however, has said that the distinction between legal and equitable title that so vitally underpins a substantive constructive trust theory has no application in cases of fraudulent conveyances, ostensibly because the creditors defrauded by the transfer have ample ability to reach the property conveyed by voiding the transfer under the fraudulent conveyance statutes without resort to general substantive principles of unjust enrichment and fraud standing independently of those statutes. See Rappleye v. Int'l Bank , 93 Ill. 396, 403 (1879) (speaking in the context of land that "[t]he deed is voidable by creditors, and the estate conveyed is subject to be divested by their action. There is no such distinction as that of equitable and legal estate applicable to the subject [of fraudulent conveyances]") (emphasis added); accord Cavadi v. DeYeso , 458 Mass. 615, 941 N.E.2d 23, 36 (2011) ("[In] cases where a constructive trust is implied for the benefit of creditors in order to set aside a fraudulent conveyance ... UFTA necessarily takes precedence ...."); Moore v. Browning , 203 Ariz. 102, 50 P.3d 852, 858 (Ariz. Ct. App. 2002) ("Considering the legal history and *774 the ... authorities, we conclude that UFTA has displaced any common law cause of action for fraudulent conveyance ...."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 1 cmt. g, 48 cmt. a (2011).
In sum, this count cannot serve as the basis for a default judgment as a matter of law. The Debtor necessarily could not have succeeded on such a claim under state law based on the allegations in this count. The Debtor's creditors could not have succeeded, either. Hence the trustee may not succeed.
d. Count IV: Resulting Trust
The trustee in Count IV attempts to assert that a resulting trust exists over the business in favor of the Debtor (or, based on the analysis above, Zig Zag as the Debtor's alter ego). He asserts in substance that if consideration was supplied for the transfer of the MMQB business, it was supplied by Michael Wolf (apparently to Scott Wolf and/or ZZC and MMQB, Inc.), and Michael Wolf's intention was to retain ownership and control over the business. Essentially, instead of intending an outright gift of the business, Michael Wolf intended that it be held in trust for him, and the fact that he caused its gratuitous conveyance (by causing himself or his alter ego to be paid with his own money) is evidence of this (because if he had really wanted to relinquish ownership and control of the MMQB business, he would only have done so for a valuable consideration, not for free). Again, it is to be remembered that, per the trustee's allegations, the transfer of the business was made as part of a scheme to defraud Michael Wolf's creditors.
Just as with the constructive trust theory asserted above, Illinois law applies. Under pertinent Illinois law,
A resulting trust is an 'intent enforcing' trust; it arises by operation of law and the presumed intent of the parties. Generally, a resulting trust arises when one person pays the consideration for property which is taken in the name of another. The resulting trust is based upon the 'natural equity' that the one who pays for the property should enjoy it. A resulting trust arises at the time of the conveyance, and the payor's intention at that time determines whether a resulting trust may be found.
In re Estate of Koch , 297 Ill.App.3d 786, 232 Ill.Dec. 189, 697 N.E.2d 931, 933 (1998). As an "intent enforcing" trust, the resulting trust is to be distinguished from the fraud-remedying constructive trust discussed above.
Much as with the constructive trust considered above, if the trustee is stepping into the Debtor's shoes, the law is quite clear that one may not convey one's property in fraud of one's creditors and then petition a court of equity for a resulting trust in one's favor over that same property. Hanley v. Hanley , 14 Ill.2d 566, 152 N.E.2d 879, 883-84 (1958) ; Rosenbaum v. Huebner , 277 Ill. 360, 115 N.E. 558, 560-61 (1917) ; Dorman v. Dorman , 187 Ill. 154, 58 N.E. 235, 237 (1900) ; Am. Nat. Bank & Tr. Co. of Chicago v. Vinson , 273 Ill.App.3d 541, 210 Ill.Dec. 426, 653 N.E.2d 13, 15-16 (1995) ; Peric v. Chicago Title Tr. Co. , 89 Ill.App.3d 271, 44 Ill.Dec. 568, 411 N.E.2d 934, 935 (1980).
Michael Wolf therefore has no claim for a resulting trust under Illinois law based on his own fraudulent conveyance. Neither does the trustee under section 541(a)(1). See Grede v. McGladrey & Pullen LLP , 421 B.R. 879, 885 (N.D. Ill. 2009) ("The essential principle of bankruptcy law is that the trustee stands in the exact place of the debtor.").
If the trustee is stepping into the shoes of creditors, the action again fails as *775 a matter of law. This is because, by definition, the resulting trust, if it exists at all, does not exist in favor of Michael Wolf's creditors, since it would be absurd to presume that the unmanifested intention of Michael and any of the defaulted transferees was for Michael Wolf's creditors to "enjoy" the MMQB business by way of the allegedly fraudulent conveyance of the business to those transferees. See Estate of Koch , 232 Ill.Dec. 189, 697 N.E.2d at 933. The resulting trust is only ever raised in favor of the person who furnished the consideration for the property conveyed, and here that would be Michael Wolf (if the allegations in this count are taken as true). See RESTATEMENT (SECOND) OF TRUSTS § 440(1959) ; see also Prassa v. Corcoran , 24 Ill.2d 288, 181 N.E.2d 138, 140-41 (1962). Thus, Michael Wolf's creditors have no claim for a resulting trust under Illinois law in this case, and so neither does the trustee under any theory of creditor-standing/authority he could possibly assert.
In sum, this count fails to state a claim as a matter of law and therefore may not be used to support the entry of a default judgment.
e. Count V: Actually Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 548(a)(1)(A)
The trustee asserts essentially two causes of action Count V. First, he asserts that the transfer of the MMQB business from Zig Zag to ZZC is avoidable as a fraudulent transfer under section 548(a)(1)(A) of the Code. Second, he asserts that the transfer of Michael Wolf's stock in ZZC to Scott Wolf is avoidable as a fraudulent transfer under section 548(a)(1)(A). As seen below, the transfer of stock is avoidable based on the allegations; the transfer of the business is not. The court begins first with the transfer of the business.
1. Transfer of the MMQB Business from Zig Zag to ZZC
The Code provides in pertinent part that
[t]he trustee may avoid any transfer ... of an interest of the debtor in property ... that was made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily- made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted ....
11 U.S.C. § 548(a)(1)(A).
There must first be a "transfer." Here, that alleged transfer was of the MMQB business. It must have been of an "interest of the debtor in property." Here, because Zig Zag was, at the time of the transfer, merely the Debtor's alter ego, the property of Zig Zag was the property of the Debtor under Illinois law. See supra Part VI.a (discussing Illinois law). When it transferred the MMQB business, the transfer therefore was "of an interest of the debtor in property." See In re Am. Int'l Refinery , 402 B.R. 728, 744-48 (Bankr. W.D. La. 2008) (applying Nevada law within the framework of the Bankruptcy Code).
The Debtor filed his bankruptcy petition on July 23, 2014. The transfer of the business must have been made on or following July 23, 2012 in order for it to be avoidable under section 548. Here, "sometime in early 2012, the Debtor transferred the Monday Morning Quarterback business to ZZC." Trustee's Amended Complaint. Docket No. 95, at ¶ 171. This is consistent with the trustee's allegation that ZZC was formed in late 2011 with the intent that the business would be transferred to it. See *776 id. at ¶ 170. July falls in the second half of the year; no reasonable person would say that something done in July of 2012 was done in "early 2012." See Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc. , 655 F.Supp.2d 177, 188 (E.D.N.Y. 2009) (noting that a party moving for default judgment is entitled to reasonable inferences).
This alleged transfer therefore falls outside of the two year window provided for in section 548. This portion of Count V therefore fails to state a claim as a matter of law and cannot be used as a basis upon which to grant a default judgment in this case.
2. Transfer of ZZC Stock from Michael to Scott Wolf
Here, the transfer alleged is of Michael Wolf's stock in ZZC. The trustee's theory is that Michael Wolf owned 100% of the stock in ZZC at one point in time and then caused a direct or indirect transfer of 51% that stock to Scott Wolf. This theory is supported by the well-pleaded facts in the complaint, including that Michael Wolf recorded on his tax return that he owned 100% of ZZC in 2012 and then later told two courts, including this court, that he only owned 49% of that same company. Based on the Debtor's tax return showing full ownership in 2012, the trustee alleges that 51% of the stock was transferred to Scott Wolf no earlier than in 2013.
Stock is undoubtedly considered the property of the stockholder; thus, the transfer of it is a transfer of an "interest of the debtor in property." See Reddy v. MBKS Co. , 945 A.2d 1080, 1087 (Del. 2008) ; Wuller v. Chuse Grocery Co. , 241 Ill. 398, 89 N.E. 796, 798 (1909).[31] The well-pleaded facts, based on Michael Wolf's 2012 tax return, demonstrate that such a transfer happened at the earliest in 2013 and thus falls within the two year window in section 548.
When considering whether such a transfer was made with actual intent to hinder, delay, or defraud the Debtor's then-existing or future creditors, courts typically look to the badges of fraud. Frierdich v. Mottaz , 294 F.3d 864, 869-70 (7th Cir. 2002).
These 'badges' include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became [in]solvent at the time of the transfer.
Id. at 870.
Some badges are present. Here, the transferee was Scott Wolf, Michael Wolf's son. Michael Wolf received no consideration for the stock. The transfer had and has been concealed - as evidenced by the factual conflict between the Debtor's tax return and the Debtor's and Scott Wolf's later contradictory assertions, as alleged in the complaint.
The rest of the badges generally are not supported by any well-pleaded facts. First, there is nothing indicating that the Debtor, at the time, retained possession or control of the 51% of stock transferred. That he *777 continued to receive business income is not necessarily relevant; he may have been receiving it on account of his position as employee or officer rather than on account of his equity holdings, or on account of gifts from his family members. Further, the transfer was not of substantially all of the debtor's assets, since he retained at least 49% of his equity in the ZZC entity, which at that time, according to the allegations, still owned the MMQB business. There is nothing to indicate that Michael Wolf "absconded" in 2013 on or around when the transfer happened. See Trustee's Amended Complaint, Docket No. 95, at ¶ 17 (noting that, more recently , the Debtor had moved to Washington state) (filed in 2016).
As to being threatened with suit by creditors, Elizabeth Wolf filed a divorce petition in December of 2013, and it might fairly be inferred that Michael was under at least some threat of that suit throughout 2013 (due him allegedly moving out of the marital residence well before 2013, namely in 201 1) or after December 2013 when the suit was actually commenced. Elizabeth Wolf, however, was not a creditor of Michael's, at least not until she obtained an order for temporary maintenance and support in the divorce court, if she obtained such an order. That is, one spouse is not the creditor of another merely based on their status as spouses, and there is nothing showing that they had a debtor-creditor relationship (i.e. , that Elizabeth Wolf had a claim against Michael Wolf) based on some other body of law.
Even if spouses could be considered contingent creditors of one another once a divorce petition is filed (due to the possibility of either (1) an alimony award or (2) a property division order that establishes a debtor-creditor relationship between the ex-spouses rather than simply making a proprietary determination as to their respective interests in marital property), that petition was not filed until December of 2013. The transfer of stock allegedly happened no earlier than 2013. It is possible, based on the trustee's theory, that the stock was transferred after the divorce petition had been filed and therefore after Elizabeth Wolf could plausibly be said to be a creditor of Michael. It is also possible that it was transferred earlier, sometime between January and November of 2013.
This badge, therefore, rather than not being present, counts somewhat in favor of the trustee. The same is true of the "insolvency" badge. The Debtor filed for bankruptcy in July of 2014. If the transfer happened in January of 2013, that bankruptcy filing (and his schedules showing balance-sheet insolvency as of that date) is not good evidence of his insolvency at the time of the transfer (over a year separates the two temporal events). Conversely, if the transfer happened in June of 2014, the bankruptcy filing is rather good evidence of his insolvency at the time of the transfer. See In re Porter , 50 B.R. 510, 517 (Bankr. E.D. Va. 1985) ; Schutte v. Rosenblum , 13 Misc.2d 818, 172 N.Y.S.2d 337, 340 (Sup. Ct. 1958). At any rate, insolvency may be alleged generally (and therefore taken as true upon the entry of a default). See CF/SPC NGU v. Chase Manhattan Bank USA, N.A. , 322 B.R. 440, 451 (Bankr. N.D. Okla. 2003) ; A. Clay Cox v. Michael W. Smith (In re Cent. Illinois Energy Coop.) , 561 B.R. 699, 714 (Bankr. C.D. Ill. 2016). This badge, therefore, counts in favor of the trustee.
There are therefore four badges conclusively tending to show actual intent and one badge (threat of suit) somewhat tending to show it. The presence of these badges based on the taken-as-true allegations in the complaint is enough to allow an inference as to actual intent to be made. See *778 Freeland v. Enodis Corp. , 540 F.3d 721, 735 (7th Cir. 2008) ; Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd. , 419 F.3d 594, 599-600 (7th Cir. 2005). This transfer was therefore actually fraudulent, and a default judgment may be entered based upon it.
f. Count VI: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 548(a)(1)(B)
Just as above, the trustee asserts two causes of action in Count VI, now arising under the constructive fraud portion of section 548 rather than the actual fraud portion. The first concerns the transfer of the MMQB business itself; the second concerns the transfer of stock from Michael Wolf to Scott Wolf
1. Transfer of the MMQB Business from Zig Zag to ZZC
The Code provides in pertinent part that
[t]he trustee may avoid any transfer ... of an interest of the debtor in property ... that was made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily- received less than a reasonably equivalent value in exchange for such transfer ...; and was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer; [or] was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured ....
11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I)-(II).
Just as above (see Part VI.e.1), this portion of Count VI fails to state a claim as a matter of law because the business was allegedly transferred in "early" 2012, whereas the transfer needs to have occurred no earlier than in July of 2012. This portion of Count VI therefore cannot support the entry of a default judgment.
2. Transfer of ZZC Stock from Michael to Scott Wolf
See the statutory language immediately above (Part VI.f.1) and the description of the transfer of stock in Part VI.e.2. The alleged transfer of ZZC stock qualifies as a transfer of an interest of the debtor in property. The complaint also sufficiently alleges that no consideration was received in exchange - which fits the complaint's well-pleaded allegations that the MMQB business was transferred between corporate entities for the purpose of evading creditors. Thus, Michael Wolf, as alleged, received less than a reasonably equivalent value in exchange for the stock, because if the MMQB business was still being operated through the ZZC entity (as it was), then the value of Michael Wolf's stock would not have been $0 (due to the fact that the MMQB business, as alleged, is and was profitable).
The complaint also sufficiently alleges insolvency ( section 548(a)(1)(B)(ii)(I) ), even though it does so in general terms only. See CF/SPC NGU v. Chase Manhattan Bank USA, N.A. , 322 B.R. 440, 451 (Bankr. N.D. Okla. 2003) ; A. Clay Cox v. Michael W. Smith (In re Cent. Illinois Energy Coop.) , 561 B.R. 699, 714 (Bankr. C.D. Ill. 2016).
This part of Count VI therefore supports the entry of a default judgment.
g. Count VII: Actually Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the Stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA § 5(a)(1)
Just as above, the trustee asserts two causes of action in Count VII, now arising *779 under the actual fraud portion of the Illinois UFTA,[32] as incorporated by 11 U.S.C. § 544. The first concerns the transfer of the MMQB business itself; the second concerns the transfer of stock from Michael Wolf to Scott Wolf.
1. Transfer of the MMQB Business from Zig Zag to ZZC
Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
11 U.S.C. § 544(b)(1).
Applicable law here is the Illinois UFTA.[33]
A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor;
740 ILCS § 160/5(a)(1).
A cause of action with respect to a fraudulent transfer ... under this Act is extinguished unless action is brought:
(a) under paragraph (1) of subsection (a) of Section 5, within 4 years after the transfer was made ... or, if later, within one year after the transfer ... was or could reasonably have been discovered by the claimant;
740 ILCS § 160/10(a).
Here, the action was brought in this court on January 29, 2016. See Complaint, Docket No. 1, at 24.[34] The transfer therefore cannot have been made earlier than on January 29, 2012 under section 10(a). The business was allegedly transferred in "early 2012." The court will draw the reasonable inference in favor of the trustee that the business was not transferred prior to January 29, 2012. See Bravado Int'l Grp. Merch. Serv's., Inc. v. Ninna, Inc. , 655 F.Supp.2d 177, 188 (E.D.N.Y. 2009) (noting that a party moving for default judgment is entitled to reasonable inferences). This cause of action is not barred by the statute of limitations.
The trustee need not identify a specific creditor capable of bringing the action, and the court may infer the existence of a creditor whose claim arose at least after the transfer, see 740 ILCS § 160/5(a)(1) (noting that qualifying creditors include creditors whose claims arose after the transfer), by the fact that claims have been filed in this bankruptcy case. See Matter of Leonard , 125 F.3d 543, 544 (7th Cir. 1997).
Has a transfer been properly alleged?
'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, *780 release, lease, and creation of a lien or other encumbrance.
740 ILCS § 160/2(1).
" 'Asset' means property of a debtor." 740 ILCS § 160/2(b). As seen above, since Zig Zag was the Debtor's alter ego under Illinois law, its property (the MMQB business) was the Debtor's property. When the MMQB business was transferred to ZZC, the Debtor (Michael Wolf) parted with an asset, namely the MMQB business, because Zig Zag enjoyed no separate legal personality apart from its sole shareholder (Michael Wolf) at that time. There was, therefore, a transfer under the Illinois UFTA.
What about actual intent? The badges of fraud under the Illinois UFTA are substantially the same as those discussed above under section 548(a)(1)(A) of the Bankruptcy Code. See Frierdich , 294 F.3d at 869-70.
(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
740 ILCS § 160/5(b).
(g) "Insider" includes:
(1) if the debtor is an individual,
(A) a relative of the debtor or of a general partner of the debtor;
(B) a partnership in which the debtor is a general partner;
(C) a general partner in a partnership described in clause (B); or
(D) a corporation of which the debtor is a director, officer, or person in control;
740 ILCS § 160/2(g)(1).
Michael Wolf was a person in control of ZZC at the time of the transfer from Zig Zag to ZZC; he was, at the very least, the owner of 100% of the stock in ZZC at that time. See Zigmond Chiropractic, P.C. v. AAA Michigan Auto. Ins. Ass'n , No. 300286, 2012 WL 3198465, at *5 (Mich. Ct. App. Aug. 7, 2012). ZZC was therefore an "insider."
The well-pleaded allegations, if taken as true, also tend to show that Michael Wolf retained control of the MMQB business no matter to which entity it had been transferred, including to ZZC. They also tend to show that the Debtor received no consideration for the transfer. As indicated above, insolvency may be alleged generally in the complaint.
*781 There are, therefore, at least four badges of fraud sufficiently alleged/pleaded here. These are sufficient to adequately plead that a transfer of property was actually fraudulent. See, e.g. , Kaibab Indus., Inc. v. Family Ready Homes, Inc. , 80 Ill.App.3d 782, 14 Ill.Dec. 334, 372 N.E.2d 139, 142 (1978) ; Armada (Singapore) PTE Ltd. v. AMCOL Int'l Corp. , No. 13 C 3455, 2013 WL 5781845, at *5 (N.D. Ill. Oct. 25, 2013) ; Dollar Tree Stores Inc. v. Toyama Partners LLC , No. C 10-0325 SI, 2011 WL 3295420, at *7 (N.D. Cal. Aug. 1, 2011) (discussing California law). A default judgment may therefore be entered on this portion of Count VII.
2. Transfer of ZZC Stock from Michael to Scott Wolf
This part of Count VII supports an entry of default judgment against Scott Wolf for substantially the same reasons as those stated in Part VI.e.2 supra .
h. Count VIII: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA § 5(a)(2)
This count alleges that the transfer of business from Zig Zag to ZZC and the transfer of stock in ZZC from Michael to Scott Wolf are avoidable under 11 U.S.C. § 544 and the Illinois UFTA as having been constructively fraudulent.
1. Transfer of the MMQB Business from Zig Zag to ZZC
As indicated above in Part V1.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows:
A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:
(2) without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
740 ILCS § 160/5(a)(2).
See Part VI.g. 1 on how the transfer of the business from Zig Zag to ZZC qualifies as a transfer made by the debtor under the UFTA and Illinois law. The well-pleaded allegations, if taken as true, in the complaint support the application of UFTA section (5)(a)(2)(B) here, since, at the time of the conveyance of the business to ZZC, Michael Wolf was planning on defrauding a likely future creditor - Elizabeth Wolf. The whole idea, according to the complaint, was to ensure that Michael Wolf could not satisfy any future obligation to Elizabeth and to ensure that Elizabeth and/or any other creditors would have no recourse to any valuable assets in the hands of Michael to satisfy any outstanding obligation.
This count therefore states a claim for relief upon which a judgment may be entered.
2. Transfer of ZZC Stock from Michael to Scott Wolf
As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows:
*782 A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:
(2) without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
740 1LCS § 160/5(a)(2).
The well-pleaded allegations, if taken as true, in the complaint support the application of UFTA section (5)(a)(2)(B) here, since, at the time of the conveyance of the ZZC stock to Scott Wolf, Michael Wolf was planning on defrauding a likely future creditor - Elizabeth Wolf. The whole idea, according to the complaint, was to ensure that Michael Wolf could not satisfy any future obligation to Elizabeth and to ensure that Elizabeth and/or any other creditors would have no recourse to any valuable assets in the hands of Michael to satisfy any outstanding obligation.
This count therefore states a claim for relief upon which a judgment may be entered.
i. Count IX: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA § 6(a)
This count alleges that the transfer of business from Zig Zag to ZZC and the transfer of stock in ZZC from Michael to Scott Wolf are avoidable under 11 U.S.C. § 544 and the Illinois UFTA as having been constructively fraudulent.
1. Transfer of the MMQB Business from Zig Zag to ZZC
As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows:
A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer ...
740 ILCS § 160/6(a).
Even though the application of section 6(a) of the UFTA (considered in conjunction with 11 U.S.C. § 544 ) requires a creditor to exist at the time of the transfer and to still hold an allowable claim at the time of the petition, the actual identification of such a creditor is not a pleading requirement. See In re Multi-Risk Management, Inc. , 1998 WL 566044, at *2 (Bankr. N.D. Ill. Sept. 8, 1998). As indicated in the sections above, the well-pleaded allegations in the complaint support the idea that the business was transferred for no consideration. Insolvency may properly be alleged generally.
This count therefore states a claim for relief upon which a judgment may be entered. A default judgment may therefore be entered based on this portion of Count IX.
2. Transfer of ZZC Stock from Michael to Scott Wolf
As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows.
*783 A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer ...
740 ILCS § 160/6(a).
As indicated in the sections above, the well-pleaded allegations in the complaint support the idea that the ZZC stock was transferred for no consideration. Insolvency may properly be alleged generally.
This count therefore states a claim for relief upon which a judgment may be entered. A default judgment may therefore be entered against Scott Wolf on this portion of Count IX for the value of the ZZC stock at the time that it was transferred to Scott Wolf.
j. Count X: Preference - Payment from Michael Wolf to ZZC
In this count, the trustee seeks to recover $234,395.68 in payments made either to or for the benefit of a creditor of Michael Wolf - ZZC - who was also an insider of the Debtor, see 11 U.S.C. § 101(31)(A)(iv). Because ZZC was an insider of the Debtor, the longer one year look-back period applies. See 11 U.S.C. § 547(b)(4)(B).
$60,728.13 was paid by Michael Wolf on behalf of ZZC for payroll taxes, and that payment occurred on March 10, 2014. See Michael Wolf's Statement of Financial Affairs, Docket No. 67, at 2. It was paid as consideration for a reduction in the Debtor's loan obligation to ZZC. Id. Another $173,667.55 was paid directly to ZZC from December of 2013 to July of 2014, with ZZC still being owed $10,903.52 at the time of the petition. Id.
The well-pleaded allegations, supported by the record in this case, show that ZZC was and is a creditor of Michael Wolf's, all of the payments made were on account of an antecedent debt, all of the payments made were made while Michael Wolf was insolvent, all of the payments were made within 1 year of the petition date, and all payments enabled ZZC to receive more than it would have in a chapter 7 case. See 11 U.S.C. § 547(b)(1)-(5).[35] Although insolvency is not presumed for periods of time more than 90 days prior to the petition, see 11 U.S.C. § 547(f), insolvency may properly be alleged generally and taken as true upon the entry of default. See, e.g. , Danning v. Lavine , 572 F.2d 1386, 1389 (9th Cir. 1978).
The trustee's preference count against ZZC states a claim upon which a default judgment may be entered. Pursuant to 11 U.S.C. § 550(a)(1), the trustee is entitled to judgment against ZZC in the amount of $234,395.68.
k. Count XI: Fraudulent Transfer - Payment from Michael Wolf to ZZC
While not naming the provision specifically, the substance of this count is clearly aimed at making out a constructive, and not actual, fraudulent conveyance action based on the same payments outlined immediately above in the preference count. See Trustee's Amended Complaint, Docket *784 No. 95, at ¶ 217 (discussing the elements of section 548(a)(1)(B) ). This count fails as a matter of law because the record in this case shows that ZZC was owed an antecedent debt by Michael Wolf, and the payments were made in satisfaction of that antecedent debt, and thus reasonably equivalent value was received in exchange for the payments. See, e.g. , In re Dewey & LeBouef, LLP , 518 B.R. 766, 789 (Bankr. S.D.N.Y. 2014) (noting that payments made on an antecedent liability are payments made in exchange for reasonably equivalent value because past consideration is still good consideration in the context of fraudulent transfer law).[36] To the extent that the trustee attempts to assert in the alternative that the payments were not made on account of an existing antecedent debt, that allegation conflicts with the record in this case, a record explicitly relied upon by the trustee in Count X, and is therefore not entitled to be taken as true even after an entry of default. See In re Indus. Diamonds Antitrust Litig. , 119 F.Supp.2d 418, 420 (S.D.N.Y. 2000).
In short, Count X asks for the court to find that the payments were made on account of an antecedent debt, and Count XI necessarily asks for the court to find that the payments were not made on account of antecedent debt. Judgment cannot be entered based on inconsistent and/or mutually exclusive legal theories. Laurence v. Atzenhoffer Chevrolet , 281 F.Supp.2d 898, 900 (S.D. Tex. 2003) ("Until an action has actually reached the point of entering a judgment , Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories.") (emphasis added). Count X has support in the record, and Count XI contradicts information in the record; importantly, the trustee does not place that record material in controversy, but rather relies on it explicitly in Count X and then pleads hypothetically and speculatively in the alternative in Count XI. See Trans World Airlines, Inc. v. Hughes , 38 F.R.D. 499, 501 (S.D.N.Y. 1965) (discussing when facts are deemed well-pleaded); Woodmar Realty Co. v. McLean (In re Woodmar Realty Co.) , 294 F.2d 785, 788 (7th Cir. 1961). The trustee will suffer no possible prejudice because the amount of the judgment is the same on either count. No judgment will therefore be entered based on Count XI.
l. Count XII: Corporate Waste
This count alleges that Scott Wolf, as an officer and director of ZZC, owed Michael Wolf a duty based on Michael Wolf's status as a shareholder of ZZC and breached that duty by causing the transfer of ZZC's assets - the MMQB business - to MMQB, Inc. for no consideration as part of Michael and Scott Wolf's overall fraudulent scheme to defraud Michael Wolf's creditors. The court will treat this as a corporate waste claim. This transfer allegedly happened in early 2014 and came after 51% of the stock in ZZC had been transferred from Michael to Scott.
First, recall that ZZC was incorporated both in Delaware and Illinois, and the complaint does not specify which ZZC is being discussed. The trustee succeeds on this theory under Illinois law, however, so Delaware law will not be considered.
The trustee's rights on this cause of action are necessarily derivative of the *785 Debtor's, because the trustee has not argued (and this court's research has not found) that the officers/directors of a corporation owe any duty whatsoever (fiduciary or otherwise) to the creditors of a shareholder of that corporation. Cf. Caulfield v. Packer Grp., Inc. , 404 Ill.Dec. 525, 56 N.E.3d 509, 519 (Ill. App. Ct. 2016) (noting that corporate officers owe a fiduciary duty to the corporation, the shareholders (like Michael Wolf in this case), and in some instances, the creditors of the corporation ). Hence, even if the trustee could step into creditors' shoes under section 544 and assert this cause of action, it would fail on the merits.
The trustee's action for corporate waste provides a direct basis for recovery. Transferring the assets of a corporation to another corporation for no consideration, as is plausibly alleged here, can easily be considered corporate waste. See 3A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1102 ("Corporate waste has been defined as an exchange of corporate assets for consideration so disproportionately small as to he beyond the range at which any reasonable person might be willing to trade."). Under Illinois law, since ZZC is a non-public corporation, Michael Wolf, and hence the trustee, may recover directly from Scott Wolf for any damages caused by the waste:
Section 12.56 [of the Illinois Business Corporation Act of 1983] gives a shareholder in a non-public corporation access to remedies when the corporation assets are being misapplied or wasted. This language gives an individual shareholder a right to individual relief for harm done by a corporation.
Toscano v. Koopman , 148 F.Supp.3d 679, 687-88 (N.D. Ill. 2015).
The relief that may be ordered includes "[t]he award of damages to any aggrieved party." 805 ILCS § 5/12.56(b)(10).
True, since the trustee's rights are derivative of the Debtor's, the trustee is bound by affirmative defenses that would be in play against the Debtor under state law on this cause of action. Peterson v. McGladrey & Pullen, LLP , 676 F.3d 594, 598 (7th Cir. 2012). But this is an action for damages, and the court has no duty to raise affirmative defenses sua sponte , though it may raise them if they appear plainly and serve to make the action facially frivolous (such as, perhaps, a clearly applicable statute of limitations). See Walker v. Thompson , 288 F.3d 1005, 1009 (7th Cir. 2002).
Here, doctrines like in pari delicto would appear to have room for application. "The doctrine of in pari delicto embodies the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." King v. First Capital Fin. Serv's. Corp. , 215 Ill.2d 1, 293 Ill.Dec. 657, 828 N.E.2d 1155, 1173 (2005) (internal quotations omitted). But on this cause of action, the application of the defense is far from clear.
For instance, while the overall, general scheme was allegedly to defraud Michael Wolf's creditors, the transfer of corporate property from ZZC to Zig Zag (the basis for this cause of action) was not itself a fraudulent transfer of the Debtor's property, because ZZC was not the Debtor's mere alter ego at the time of the transfer. Hence the defense of in pari delicto , which bars a plaintiff from recovering damages resulting from wrongdoing where the plaintiff participated in wrongdoing , has no clear application to the facts of this transaction, since the transfer of ZZC property was not itself wrongful as to Michael Wolf's creditors, who have no conceivable *786 interest in the property of a corporation not Michael Wolf's alter ego.[37]
Hence, there is no affirmative defense of clear application making the trustee's Debtor-derivative corporate waste theory frivolous on its face. It would therefore be improper for this court to consider any defenses sua sponte . Even if the court could consider them, they would not readily apply to the facts of the particular transaction out of which the cause of action derives.
Thus, because Michael Wolf could recover directly under Illinois law for corporate waste against Scott Wolf on the allegations here if taken as true, so can the trustee based on section 541(a)(1). A default judgment may be entered on this count.
m. Count XIII: Tortious Interference with Contract
This count asserts a state law cause of action against the Debtor that allegedly accrued to the trustee due to the Debtor's having tortiously interfered with a contract entered into by the trustee on behalf of the estate to sell estate property (the marital home). The merits will not be discussed, because the damages sought are not for a sum certain or otherwise capable of ready ascertainment, and the trustee has offered no proof as to the proper amount of damages. See In re Catt , 368 F.3d 789, 793 (7th Cir. 2004). No default judgment will be entered on this count.
n. Count XIV: Tortious Interference with Prospective Economic Advantage
For the same reasons as stated immediately above with respect to Count XIII, no default judgment will be entered on this count.
o. Counts XV-XVIH: Denial of Debtor's Discharge
These counts ask the court to deny the Debtor's discharge under various parts of section 727(a). The court finds that the Debtor's discharge should not be granted based on the operation of section 727(a)(5). Pertinently,
[t]he court shall giant the debtor a discharge, unless- (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.
11 U.S.C. § 727(a)(5).
Here, the facts alleged in the complaint plausibly show, if taken as true, that the Debtor caused a deficiency in his assets to meet his liabilities.[38] Since the alleged facts, if taken as true, show that the deficiency *787 was caused by a fraudulent design, it is difficult to conceptualize how such a deficiency could ever be "explain[ed] satisfactorily." In any event, the court concludes that it has not been. For that reason, the trustee is entitled to a default judgment stating that the Debtor shall not receive a discharge in this case.
Additionally, the remaining counts operate to bar the Debtor's discharge. Under section 727(a)(2), the trustee has adequately pled that the Debtor, with intent to hinder, delay, and defraud creditors, transferred his Aston Martin within one year of the petition (and was allegedly sentenced to jail by the family court for having done so). Under section 727(a)(3), the trustee has adequately pled that the Debtor failed to keep adequate records relating to business transactions. Similarly, the trustee has adequately pled, based on the contradictory information in the Debtor's tax return, that the Debtor knowingly lied under oath in this proceeding regarding his ownership of ZZC. See 11 U.S.C. § 727(a)(4).
Hence a final judgment will be entered denying the Debtor his discharge in this case.
p. Counts XIX-XXIII: Fraudulent Transfer of the MMQB Business from ZZC to MMQB, Inc.
As seen above, the court is not treating ZZC as the Debtor's alter ego. Thus, as it enjoys a separate legal existence, the transfer of its property (the MMQB business) to MMQB, Inc. is not remediable under either the Illinois UFTA and section 544(b) or section 548, because the application of either statute requires the transfer to have been of the Debtor's property. For that reason, no default judgment may be entered based on these counts
q. Count XXIV: Section 549 Post-Petition Transfers
This count asks for damages based on alleged transfers of property of the estate (the MMQB business and/or its proceeds) post-petition. No default judgment will be entered on this count because the MMQB business could not possibly have become property of the estate prior to its transfer having been avoided as fraudulent. See, e.g. , In re ABC-Naco, Inc. , 331 B.R. 773, 780-81 (Bankr. N.D. Ill. 2005) ; see also 11 U.S.C. § 541(a)(3). Hence none of the transfers complained of in the complaint could possibly have been transfers of property of the estate.
r. Remedies against Particular Defendants
1. ZZC's Preference Liability and the Debtor's Discharge
First, the trustee is entitled to a money judgment against ZZC for its preference liability discussed above. See 11 U.S.C. § 550(a)(1). He is also entitled to this court's order denying the Debtor his discharge. The court will enter final judgment against ZZC on Count 10 of the complaint and will enter final judgment against the Debtor on Counts 15-18 of the complaint.
2. ZZC's, MMQB, Inc.'s, and Scott Wolf's Liability under Section 550(a) for the Fraudulent Transfer of the MMQB Business under Counts 1, 7, 8, and 9 of the Complaint
For the fraudulent transfer of the MMQB business in early 2012, the trustee has provided an expert forensic valuation report[39] determining the value of *788 the business, in late 2011, to have been $2.1 million.[40] The trustee may properly elect a monetary recovery under section 550(a). In re Erin Food Servs., Inc. , 980 F.2d 792, 797 (1st Cir. 1992). He may recover the value of the business at the time that it was fraudulently transferred. See Grochocinski v. Schlossberg , 402 B.R. 825, 841 (N.D. Ill. 2009) ; In re James B. Downing & Co. , 74 B.R. 906, 911 (Bankr. N.D. Ill. 1987). Here, the alleged transfer happened in early 2012, so the trustee's late 2011 valuation is sufficient to provide a reliable basis on which judgment may be entered for the value of the MMQB business at the time of the transfer.
That value may be recovered from initial transferees and from subsequent transferees subject to exceptions not applicable here. See 11 U.S.C. § 550(a)(1)-(2). ZZC is an initial transferee of the business. MMQB, Inc. and Scott Wolf are subsequent transferees of the MMQB business.
The trustee's valuation date (late 2011) is close in time to the initial transfer from Zig Zag (the Debtor's alter ego) to ZZC in early 2012 and so provides good evidence of the value of the MMQB business at the time that it was allegedly transferred in early 2012.
To the extent that MMQB, Inc.'s and Scott Wolf's liability under section 550(a)(2) as subsequent transferees of this business is limited to the amounts that they actually received (so the value of the business in early 2014 when the subsequent transfer allegedly happened), the court finds that the expert forensic report is good evidence as to the value of the business when transferred from ZZC to MMQB, Inc. in early 2014. Though two years out of date for that purpose, MMQB, Inc. and Scott Wolf have forfeited their right to introduce evidence to the effect that the value of the business as received by them at that later date was less than the value of the business when received by ZZC in early 2012. Given the blatant gamesmanship and disregard of discovery obligations in these proceedings, the trustee's late-2011 valuation report will suffice.
Scott Wolf, SHBM, Hound Ventures, and Michael Wolf, as alleged, are subsequent (mediate or immediate) transferees of the proceeds, products, or profits of the allegedly fraudulently transferred property (the MMQB business). The value of the MMQB business may be recovered from ZZC as an initial transferee and from Scott Wolf and MMQB, Inc. as subsequent transferees. Due to the lack of introduced expert forensic evidence, speculative or otherwise, as to the amounts of proceeds, products, or profits actually received by SHBM, Scott Wolf, Michael Wolf, and Hound Ventures, however, no default judgment *789 may be entered against them under section 550(a)(2).[41]
As seen above, the transfer of the MMQB business from Zig Zag to ZZC is avoidable as a fraudulent transfer under section 544 (Counts 1, 7, 8, and 9) of the Code.
(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a).[42]
ZZC was the initial transferee of the transfer, so it may be held liable for the value of the business at the time that it was transferred. The Debtor-transferor (Michael Wolf) may not be held liable as a transferor, an initial transferee, or as the entity for whose benefit the transfer was made. In re Coggin , 30 F.3d 1443, 1452-54 (11th Cir. 1994), abrogated on other grounds by Kontrick v. Ryan , 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) ; In re Pocius , 556 B.R. 658, 670 (Bankr. E.D. Pa. 2016) ; In re Fleming , 424 B.R. 795, 800-01 (Bankr. W.D. Mich. 2010) ; In re Big Apple Scenic Studio, Inc. , 63 B.R. 85, 88 (Bankr. S.D.N.Y. 1986).[43]
Based on the well-pleaded facts, MMQB, Inc. is a subsequent transferee under section 550(a)(2). Because, based on the facts in the complaint, MMQB, Inc. has no defense under section 550(b), MMQB, Inc. is liable for the value of the business at the time of the initial fraudulent transfer. See 11 U.S.C. $ 550(a)(2).[44]
Moreover, the allegations show that Scott Wolf, the sole shareholder, Director, *790 and officer of MMQB, Inc., used MMQB, Inc. to aid Michael Wolf in hiding assets from his creditors. The allegations recount with some detail how Scott Wolf disregarded corporate formalities with respect to MMQB, Inc. and entered into one-sided, non-arms length transactions with multiple related entities (these other entities were also wholly owned and controlled by Scott) in order to siphon off value from the MMQB business being run through the MMQB, Inc. legal entity. See Trustee's Amended Complaint. Docket No. 95, ¶¶ 67-103.
These allegations are enough to sufficiently allege that MMQB, Inc. was Scott Wolf's alter ego (or that MMQB, Inc.'s veil may be pierced) under Delaware law.[45] Yu v. GSM Nation , LLC , No. CV 12293-VCMR, 2017 WL 2889515, at *3 (Del. Ch. July 7, 2017). As such, if MMQB, Inc. is a subsequent transferee of the MMQB Business (which it is), so is Scott Wolf.[46] Cf. In re Stephen S. Meredith, CPA, P.C. , 367 B.R. 558, 562 (E.D. Va. 2007) (noting that where the corporate veil is pierced, the sole shareholder of a transferee may also be a transferee), aff'd sub nom. In re Meredith , 527 F.3d 372 (4th Cir. 2008). Scott Wolf is therefore liable for the value of the business to the same extent that MMQB. Inc. is.
Scott Wolf, Hound Ventures, and SHBM could be liable as subsequent transferees for a different reason, as well. To the extent the proceeds, products, or profits of the fraudulently transferred MMQB business have been plausibly alleged to have been transferred (whether formally by way of salaries, dividends, distributions, or otherwise) to other mediate or immediate transferees, those transferees are liable under section 550(a)(2). Cf. In re Bruno Mach. Corp. , 435 B.R. 819, 848 (Bankr. N.D.N.Y. 2010) ; see also Bank of Am., N.A. v. Veluchamy , 535 B.R. 783, 797 (N.D. Ill. 2015) (using an illustration), aff'd sub nom. In re Veluchamy , 879 F.3d 808 (7th Cir. 2018). To the extent the money paid out from MMQB, Inc. would need to have been traced (to establish that it really is or was the products, proceeds, or profits of the allegedly fraudulently transferred business) in the event of a trial, it is to be remembered that the only question here is whether the allegations have been properly pled. Cf. In re Elscint, Ltd. Sec. Litig. , 674 F.Supp. 374, 382-83 (D. Mass. 1987). Here, they have been. See Trustee's Amended Complaint, Docket No. 95, at ¶¶ 76-103 (discussing in some detail the various ways in which the profits of the MMQB business have been funneled to Hound Ventures, SHBM, and Scott Wolf). Accordingly, since there is no viable defense under section 550(b) for either Scott *791 Wolf, Hound Ventures, or SHBM, all may properly be held liable as the recipients of the proceeds, products, or profits of the fraudulently transferred business under section 550(a)(2). Cf. In re Norris , No. 05-43551-7, 2007 WL 3275196, at *3 (Bankr. D. Kan. Oct. 29, 2007) (applying a different body of law, but noting generally that tracing property into money proceeds is proper where there is bad faith or notice of the fraud); see also In re Bernard L. Madoff Inv. Sec. LLC , 548 B.R. 13, 38 (Bankr. S.D.N.Y. 2016) (discussing transferee knowledge in the context of the transferee of the proceeds of an avoidable transfer).
The same might hold true of Michael Wolf to the extent that he (as is alleged) received proceeds, products, or profits from the MMQB business, whether housed in ZZC or MMQB, Inc. See In re Fehrs , 391 B.R. 53, 76-77 (Bankr. D. Idaho 2008).
The trustee's issue, however, is that subsequent transferees are only liable under section 550(a)(2) up to the amounts that they actually receive from a prior transferee. See In re First Fin. Assocs., Inc. , 371 B.R. 877, 916 (Bankr. N.D. Ind. 2007) ("To the extent [the subsequent transferee] is derivatively liable at all under 11 U.S.C. § 550(a)(2), the [subsequent transferee] is only liable for amounts he received from [the initial transferee] which constituted a fraudulent transfer by the [Debtor-transferor] to [the initial transferee]."); see also In re CNB Int'l. Inc. , 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008), aff'd on other grounds , 440 B.R. 31 (W.D.N.Y. 2010) ; In re Allegro Law LLC , 545 B.R. 675, 762 (Bankr. M.D. Ala. 2016).
The problem is one of evidence as to the amounts. They are neither liquidated nor capable of definite ascertainment from materials already in the record. The allegations cannot suffice, because one does not admit damages on default. The trustee has offered no expert report, based on forensics or otherwise, to substantiate, even speculatively if necessary based on the evidence available in this case, how much it is likely that each subsequent transferee received as proceeds, profits, or products from the transferred MMQB business.[47] For that reason, despite the well-pleaded allegations of income being transferred to various defaulted Defendants, no default judgment may be entered on the basis that the recipients of that income are bad faith subsequent transferees under section 550(a)(2) of fraudulently transferred property. See In re Catt , 368 F.3d 789, 793 (7th Cir. 2004).
Accordingly, final judgment will be entered against ZZC, Inc. (both Delaware and Illinois) and Scott Wolf on Counts 1, 7, 8, and 9 of the complaint.[48] The judgment *792 will be for $2,100,000, the established value of the MMQB business in late 2011.
As to MMQB, Inc., which has not consented to this court's adjudication of the alter ego claim/theory underlying its liability, this court will not enter final judgment but will instead, on the basis of the foregoing opinion, recommend that the District Court enter final judgment against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint in the amount of $2,100,000. See Fed. R. Bankr. P. 9033.
3. Scott Wolf's Liability under Section 550 for the Fraudulent Transfer of 51% of the Stock in ZZC under Counts 5-9 of the Complaint
As indicated in Counts 5-9, the transfer of stock to Scott Wolf is avoidable as a fraudulent transfer under section 544(b) and 548 of the Code.[49] Scott Wolf was the initial transferee of that stock. Hence, a judgment may be entered against him for its value under section 550(a)(1).
As indicated in the allegations, ZZC, like Zig Zag, was a corporate entity used to hold the MMQB business. It did not hold any other substantial property or house any other businesses. Hence the value of the non-publicly traded stock in ZZC should correspond to the value of the underlying MMQB business allegedly held by the entity. See Jarvis v. Bell , 296 Pa. 568, 146 A. 153, 155 (1929) ("The stockholders own the corporation, and, in the absence of market value, the best evidence of the worth of the stock is the actual value of the corporate property."); Gorham v. Massillon Iron & Steel Co. , 284 Ill. 594, 120 N.E. 467, 471 (1918) ; Moody v. Sec. Pac. Bus. Credit. Inc. , 971 F.2d 1056, 1069 n.18 (3d Cir. 1992) ("[A]lthough ownership of [a corporation's] stock may not constitute ownership of its property, evidence of the value of a [corporation's] property is admissible to establish the value of its stock.").
The value of the underlying MMQB business is established in the trustee's expert report at $2,100,000 in late 2011 (again, this value is established by way of a valuation of the Debtor's 100% interest in Zig Zag Corporation, which at that time housed the MMQB business and did not engage in other business activities nor hold other substantial property). Due to the issues with discovery in this case, and due to the fact that Scott Wolf has forfeited his right to introduce evidence as to the depreciation of the business-value from 2011 to 2013,[50] this valuation report suffices to establish the value of the business in 2013 when the stock transfer allegedly happened.[51]
For that reason, the value of the property transferred (the stock) at the time of *793 this transfer is equal to 51% of the value of the MMQB business as established in the report, which is equal to $1,071,000. Judgment will be entered against Scott Wolf in this amount.[52]
4. Scott Wolf's liability under the Corporate Waste Cause of Action
As seen above, under section 541(a)(1), the trustee brought and succeeded on a state law corporate waste cause of action against Scott Wolf. As provided for by Illinois statute, he may recover damages directly from Scott Wolf. Michael Wolf allegedly owned 49% of the stock in ZZC at the time that Scott Wolf, as officer/director, caused ZZC to transfer its property for no consideration to MMQB, Inc. in early 2014. As alleged, ZZC did not own, at the time, substantially any other property or run any other businesses. Hence the value of the stock corresponds to the value of the underlying MMQB business owned by ZZC. See Jarvis , 146 A. at 155 ("The stockholders own the corporation, and, in the absence of market value, the best evidence of the worth of the stock is the actual value of the corporate property."); Gorham , 120 N.E. at 471 ; Moody , 971 F.2d at 1069 n.18 ("[A]lthough ownership of [a corporation's] stock may not constitute ownership of its property, evidence of the value of a [corporation's] property is admissible to establish the value of its stock ").
The damages to Michael Wolf, as shareholder, caused by the corporate waste - the transfer of corporate property for no consideration - quite clearly equal the difference between the value his shares in ZZC would have had had the transfer never happened and the value that his shares in fact had after the transfer happened. Since ZZC owned nothing but the MMQB business, and since the MMQB business, as alleged, was transferred to MMQB, Inc. for no consideration, the value of his shares after the transfer happened would have been $0. The value they would have had in the absence of that transfer is equal to 49% of the value of the underlying MMQB business held by ZZC immediately before the transfer.
The transfer constituting corporate waste allegedly happened in early 2014. The trustee's valuation report values the business as of late 2011. Nonetheless, due to the many issues with discovery in this case, and due to the fact that Scott Wolf, by having been held in default, has forfeited his right to contest the valuation (and introduce evidence as to a depreciation in the value of the business by the time of the transfer in early 2014),[53] the court deems the trustee's report sufficient evidence of the value of the MMQB business (and hence of Michael Wolf's stock in ZZC) as of the time of the transfer from ZZC to MMQB, Inc. in early 2014. Hence a judgment will be entered against Scott Wolf for 49% of the value of that stock, or $1,029,000.
Conclusion
A money judgment will be entered against Scott Wolf for $2,100,000 in the aggregate based on his liability under section 550(a)(2) as a subsequent transferee of the MMQB business, his liability under *794 section 550(a)(1) as an initial transferee of 51% of the ZZC stock, and his liability under substantive Illinois corporate law for corporate waste.
The treatment of Zig Zag as Michael Wolf's alter ego, the avoidance of the transfer of the MMQB business from Zig Zag to ZZC, and the treatment of MMQB, Inc. as Scott Wolf's alter ego allow the trustee to recover $2,100,000 from Scott Wolf as a subsequent transferee under section 550(a)(2). The avoidance of the transfer of ZZC stock from Michael Wolf to Scott Wolf gives the trustee a second legal basis to recover $1,071,000 from Scott Wolf, this time under section 550(a)(1).[54] Finally, Scott Wolf's pre-bankruptcy state law liability to Michael Wolf (and hence to the trustee - see section 541(a)(1) ) for corporate waste gives the trustee a third legal basis to recover $1,029,000 from Scott Wolf. But it is obvious that, in substance, no matter the legal theory, the underlying injury precipitating each recovery is the loss, in each legal scenario, of the value of the MMQB business (whether that value is represented directly or derivatively by way of stock value). Hence the trustee may not recover more than $2,100,000 from Scott Wolf, though Scott Wolf's liability to the trustee for that amount ultimately rests on three separate legal grounds.[55]
A money judgment will be entered against ZZC, Inc. for $2,100,000 based on its status as an initial transferee of the MMQB business under section 550(a)(1).
As regards MMQB, Inc., this opinion shall serve as this court's proposed findings of fact and conclusions of law, with the court's recommendation and ultimate proposed conclusion of law being that judgment be entered against MMQB, Inc. in the amount of $2,100,000 based on its status as a subsequent transferee of the fraudulently transferred MMQB business under section 550(a)(2).
A separate money judgment will be entered against ZZC, Inc. for $234,395.68 based on its status as the initial transferee of preference payments in that amount. A final judgment will be entered denying the Debtor, Michael Wolf, his discharge in this case based on sections 727(a)(2) - (a)(5).
Regarding the defaulted Defendants, namely Scott Wolf, Michael Wolf, Peter Wolf, SHBM, Inc., Hound Ventures, Inc., MMQB, Inc., Zig Zag Corporation, and ZZC, Inc., these proceedings are otherwise terminated in all respects.
There is no just reason for delay, and any final judgment entered based upon this opinion shall be final and appealable.
*795 See Fed. R. Bankr. P. 7054 ; Fed. R. Civ. P. 54(b).

There is both a Delaware and an Illinois ZZC, Inc. The court refers to them collectively as "ZZC, Inc." or simply "ZZC."

The court, upon a review of the main complaint and the separate complaints against SHBM, Inc., MMQB, Inc., and Hound Ventures, Inc., treats SHBM, Inc. and Hound Ventures Inc. as potential subsequent transferees of profits/proceeds/products of the MMQB business under section 550(a)(2) of the Code. The court otherwise proceeds count-by-count in the main complaint only.

Both wholly owned and controlled by Scott Wolf.

There are other theories, such as the tortious interference theories, discharge-denial theories, and preference/fraudulent transfer theories (regarding payments made to ZZC), that do not concern the value of the MMQB business or the entities allegedly holding or having held that business. Nothing has been presented to the court, however, indicating that the Plaintiff does not want the entire complaint adjudicated by the court in entering default judgment against the defaulted Defendants. In the interest of finality, this court will adjudicate every count in the main complaint as against the defaulted Defendants. This opinion and any related orders/judgments issued in relation to this opinion leave nothing further to be adjudicated by this court regarding the defaulted Defendants in these proceedings.

There is some confusion as to whether or not the alter ego claim, as asserted in this case, is a standalone action or really a mere adjunct to the trustee's other theories of relief. The court, out of an abundance of caution, treats the alter ego claim as a standalone action supplying the necessary predicate for most of the other relief that the trustee seeks in the complaint.

Even if these particular counts did not "arise in" the bankruptcy case, they would still be "related to" the bankruptcy case.

A good argument can be made that the resulting trust count is not statutorily core due to the theory inherently having nothing to do with remedying fraud, whether practiced on creditors or anyone else. In that event, see In re Guy F. Atkinson Co. of California , No. C 98-4577 SI, 2000 WL 52317, at *2 (N.D. Cal. Jan. 18, 2000), judgment on the count is effectively being entered against the trustee, as seen below, and the trustee has consented to this court's authority to enter final judgments, see 28 U.S.C. § 157(c)(2).

That being said, there is a at least a formal difference between "avoiding" a transfer outright as to certain parties and granting remedies based on that avoidance, as happens under the fraudulent conveyance statutes, and declaring that the transferee of property holds the property in trust for some other entity (who, in equity, owns the asset), as apparently happens with non-statutory constructive/resulting trust actions.

The case at bar involves no trusts, only corporations.

Both Roman and Arabic numerals are used interchangeably below in reference to the numbered counts in the complaint.

As a general principle, this is undoubtedly true.

Counts 10-11 and 15-18 (dealing with Michael Wolf's discharge) do not implicate Scott Wolf. In any event, those counts are statutorily and constitutionally core irrespective of litigant consent.

In any event, Counts 10-11 run against ZZC only and are core irrespective of litigant consent.

Some of the defaulted Defendants have, of course, vigorously contested the legal sufficiency of the trustee's complaint in these proceedings, as well as the trustee's standing and authority to bring the causes of action being brought.

The automatic stay was lifted to allow the family court to do this. See 11 U.S.C. § 362(b)(2)(iv) ; Order Granting Mot. Relief from Stay, Docket No. 53, 14bk27066, at 2.

This is because the bankruptcy estate succeeded only to whatever property interests the Debtor had on the petition date, which, as concerns marital property, would have been only his contingent interest in the marital property. See Thorpe , 881 F.3d at 539.

True, the court first begins by saying that Mr. Wolf "assigns any interest that he might have in Zig Zag Corporation," but then goes on to say "his forty-nine per cent (49%) interest in Zig Zag Corporation." This potentially creates an ambiguity, but the language is unambiguous when reconciled with the language of the final judgment, which clearly states "49% interest in Zig Zag Corporation."

If there were other marital property that could or should have been divided by the family court, that is an issue to be raised by the parties in state court. Since this court lifted the stay to allow the family court to divide the marital property, it is not in a position to decide what the marital property was or is under 750 ILCS § 5/503(a) and must proceed solely based on the description given by the family court in its final judgment and preceding findings/rulings. This deference to the state court is especially appropriate in the family law context. See, e.g. , Barber v. Barber , 62 U.S. 582, 584, 21 How. 582, 16 L.Ed. 226 (1858).

Of course, it is to be remembered that there is a fundamental legal distinction between having a proprietary interest in an asset and having a claim or right to payment against or from the legal person who owns that asset. Whether Elizabeth Wolf has a proprietary interest in any recovery realized by the trustee (and to what extent), and/or whether she has a "claim" against this bankruptcy estate (and to what extent), are questions that have not yet been ruled upon with any finality by this court, except to say that the award of 51% of Zig Zag Corporation to Elizabeth Wolf, or the award of any of the other property actually awarded by the family court, does not undercut the trustee's standing or authority to bring the causes of action asserted in this adversary proceeding.

40 F.3d 890 (7th Cir. 1994).

563 F.3d 639, 645-47 (7th Cir. 2009).

See In re Rehabilitation of Centaur Ins. Co. , 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015, 1018 (1994) ("[T]he general law mandates that the piercing of a corporate veil must never be made for the benefit of the corporation or its shareholders .") (internal quotations and citations omitted) (emphasis added).

As seen below in Part VI.a. the court's focus on Zig Zag Corporation is due to the very uncertain state of Illinois and Delaware law in this area and the close resemblance of the trustee's "alter ego" claim to a "reverse veil-piercing" claim, with some courts, most prominently the court in In re Glick , noting that reverse piercing is not generally accepted at all, whether based on the piercing claim of a shareholder of the corporation ("insider" reverse piercing) or of the shareholder's creditors ("outsider" reverse piercing). Due to that uncertainty in state law, the court finds it appropriate to err on the side of caution and treat only Zig Zag Corporation as Michael Wolf's alter ego under Count I of the complaint due to the fact that there is no doubt in the allegations that Michael Wolf owned 100% of the stock in Zig Zag Corporation at all relevant times and, as is especially important, at the time of the allegedly fraudulent transfer of the corporation's assets to ZZC. The same cannot be said of ZZC, especially at the time of the alleged transfer of ZZC's assets to MMQB, Inc. As for MMQB, Inc., that corporation was never owned by Michael Wolf, and this court can discover no Delaware cases (MMQB, Inc. is a Delaware corporation) indicating that a corporation may be treated as the alter ego of someone who owns no shares in that corporation in the manner in which the trustee seeks to use the doctrine (i.e. , to collapse the separate legal personalities such that the property of one is simply the property of another). Thus, of the three entities that at one time allegedly owned the MMQB business (and which were either transferors or transferees of that business), which business is at the heart of these proceedings, only Zig Zag corporation has its corporate form disregarded below in Count I. The rest of the corporations, for the purposes of resolving this action, are deemed to enjoy their separate existence under state law.

This description of the complaint does not in any way bind parties, such as Melissa Skolnick, who have not been held in default.

As noted above, there is a lingering question as to whether Elizabeth Wolf is a creditor of the estate and to what extent.

All alleged transferors/transferees of the MMQB business (Zig Zag, ZZC, and MMQB, Inc.) were Illinois and Delaware corporations.

Even if the trustee were asserting a substantive consolidation theory under substantive federal bankruptcy law, the Seventh Circuit has never formally endorsed the concept, and, importantly, there are grave issues associated with using the doctrine to draw non-debtor entities involuntarily into a bankruptcy proceeding. See In re Concepts Am., Inc. , No. 14 B 34232, 2018 WL 2085615 (Bankr. N.D. Ill. May 3, 2018).

296 F. App'x 494 (6th Cir. 2008).

Since there is no general federal common law, this count necessarily rests on substantive state law. See, e.g. , Briggs v. Goodyear Tire & Rubber Co. , 79 F.Supp.2d 228, 237 (W.D.N.Y. 1999). The parties have not argued the issue as to which state's law applies. Of all the states, Illinois quite clearly has the most significant relationship both to the MMQB business (the allegedly transferred asset or aggregation of assets) and to the parties to this proceeding. Cf. Restatement (Second) of Conflict of Laws § 222 (1971). Substantive Illinois law will therefore be applied. This holds for all counts below regarding the transfer of the MMQB business and/or the stock in ZZC where those counts are based on state law (such as the UFTA) and not on substantive federal law (such as section 548 of the Code).

The trustee alleges no facts supporting the idea that the MMQB business was held in trust for Michael Wolf's creditors prior to its allegedly having been fraudulently conveyed in fraud of those creditors' rights.

If 51% of the company was transferred by way of stock issuance rather than by way of an actual transfer of shares from Michael to Scott Wolf, the result would be the same. See Bank of America v. Veluchamy , 535 B.R. 783, 793-95 (N.D. Ill. 2015), aff'd , 879 F.3d 808 (7th Cir. 2018).

See supra note 29.

There has been no argument on which state's law applies to the transfer at issue. Upon a review of both Delaware's and Washington's fraudulent transfer legislation, there does not appear to be a material difference between the bodies of law that could plausibly be applied in this proceeding. Illinois law will therefore be applied. See also supra note 29.

The amended complaint, at least as far as Count VII is concerned, relates back to this original date. Compare Complaint, Docket No. 1, at ¶¶ 172-74, with Amended Complaint, Docket No, 95, at ¶¶ 195-98; see Fed. R. Bankr. P. 7015 ; Fed. R. Civ. P. 15(c)(1)(B) ; Neita v. City of Chicago , 830 F.3d 494, 498 (7th Cir. 2016).

The trustee is entitled to the reasonable inference that these payments would cause ZZC to do better than in a chapter 7 liquidation because the assertion is made in the complaint and (1) there is no reason to believe that ZZC's debt was fully secured with a lien on any of Michael Wolf's property as of the petition date, and (2) there is no reason to believe that this estate will necessarily pay unsecured creditors 100% of their claims in this case. See Palmer Clay Products Co. v. Brown , 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936) ; In re Smith's Home Furnishings, Inc. , 265 F.3d 959, 964 (9th Cir. 2001).

That is not to say that a preference count and a fraudulent transfer count based on the same transfers are always mutually exclusive. Claims based on an actually fraudulent transfer, see 11 U.S.C. § 548(a)(1)(A), do not implicate the concept of "reasonably equivalent value" and thus could consistently stand alongside a preference claim based on the same transfer. See In re Equip. Acquisition Res., Inc. , 481 B.R. 422, 426-28 (Bankr. N.D. Ill. 2012).

"Unclean hands," a separate doctrine, only applies w here equitable relief is sought. Thomson Learning, Inc. v. Olympia Properties, LLC , 365 Ill.App.3d 621, 302 Ill.Dec. 877, 850 N.E.2d 314, 325 (2006). Even if it could apply to an action for corporate waste, and even if the transfer of corporate property from ZZC to MMQB, Inc. had been a transfer of Michael Wolf's property (and hence wrongful and inequitable as to his creditors), the doctrine could not possibly be used under Illinois law by Scott Wolf (the Defendant) against Michael Wolf (the person into whose shoes the trustee-Plaintiff is stepping). See Evangeloff v. Evangeloff , 403 Ill. 118, 85 N.E.2d 709, 713-14 (1949) (discussing the rule that for the doctrine of unclean hands to bar an equitable action, the plaintiff must have engaged in inequitable conduct respecting the transaction at issue and respecting the defendant in the instant action, not respecting third-parties).

This does not depend on any alter ego theory. If the value of Michael Wolf's assets is or would be comprised predominantly of the value of his equity in certain companies, and if he, as alleged in this case, intentionally caused those companies to drain their assets and thereby destroy the value of his equity in the companies, he can fairly be said to have caused a deficiency in his assets relative to his liabilities.

No defaulted Defendant has a right to a hearing on damages. See Norfolk & W. Ry. Co. v. Cent. States Trucking Co. , No. 97 C 3642, 1998 WL 26175, at *2-3 (N.D. Ill. Jan. 15, 1998). The report's veracity (and methodological soundness) is attested to by its preparers, admittedly not under penalty of perjury, and the report relies upon definite figures, backed up in many cases by reference to exhibits, to arrive at its ultimate valuation figure. See id. (discussing Seventh Circuit precedent). In any event, no defaulted Defendant has formally requested a hearing on damages, and the court therefore deems any argument that a hearing is required to be waived and/or forfeited.

Technically, the Debtor's 100% interest in Zig Zag was valued in the report; the Debtor never transferred that interest, fraudulently or otherwise. Nonetheless, the value of that interest is highly relevant evidence as to the value of the underlying business where, as here, the corporate entity did not substantially own any other property or run any other businesses. See Jarvis v. Bell , 296 Pa. 568, 146 A. 153, 155 (1929) ("The stockholders own the corporation, and, in the absence of market value, the best evidence of the worth of the stock is the actual value of the corporate property."); Gorham v. Massillon Iron & Steel Co. , 284 Ill. 594, 120 N.E. 467, 471 (1918) ; Moody v. Sec. Pac. Bus. Credit. Inc. , 971 F.2d 1056, 1069 n.18 (3d Cir. 1992) ("[A]lthough ownership of [a corporation's] stock may not constitute ownership of its property, evidence of the value of a [corporation's] property is admissible to establish the value of its stock.").

The expert report only purports to value the MMQB business (by valuing the Debtor's 100% interest in Zig Zag in late 2011); it does not purport to establish how much each defaulted Defendant received as dividends, distributions, salaries, etc., from the business substantially over the periods of time (for instance, during the existence of MMQB, Inc. (which began no earlier than early 2014) ) alleged in the trustee's complaint.

To the extent the trustee seeks remedies for his fraudulent conveyance counts other than those given in section 550, the trustee's request for those remedies is denied. See In re Teligent. Inc. , 307 B.R. 744, 750 (Bankr. S.D.N.Y. 2004).

This makes sense. Even if the Debtor were treated as the alter ego of ZZC, the initial corporate transferee (a traditional, non-reverse-piercing type of claim of the kind not considered in Part VI.a, above), then he would be both the transferor and initial transferee of the fraudulent transfer. But one clearly cannot transfer property to oneself. It is a conceptual absurdity. Similarly, the court in Coggin considered the possibility that debtors might benefit in a real and substantial way from their fraudulent transfers by retaining control of the assets transferred but keeping those assets out of the reach of the bankruptcy process, as allegedly happened in this case. See Coggin , 30 F.3d at 1453 (citing this as one of two ways in which a debtor might benefit from its own fraudulent transfer). Nonetheless, the court concluded that "there is no cause of action created by section 550(a)(1) in a trustee to recover the value of an avoidable conveyance from a transferring debtor." Id. at 1454 This reasoning seems to place debtor-transferors beyond the reach of section 550(a)(1) even where they intend to receive and in fact achieve real economic benefit from the transfer. Accordingly, neither Michael Wolf nor Zig Zag is liable under section 550(a)(1).

The court can discover no cases dealing with whether, in the case of a recovery from a subsequent transferee, the measure of value is made at the time of the transfer to the subsequent transferee (here from ZZC to MMQB, Inc.) or at the time of the initial fraudulent transfer (here from Zig Zag to ZZC). This court opts for the latter date of measure in this case, which is closer in time to the trustee's forensic valuation report. In any event, as seen in the main text, if MMQB, Inc. is indeed liable as a subsequent transferee only for the value of the business at the time that it was transferred to MMQB, Inc., the court finds that, under the circumstances of this case, the trustee's valuation report suffices to reliably establish the value of the business at the time of that years-later transfer in early 2014.

MMQB, Inc. is a Delaware corporation.

There is no allegation that, and this court does not conclude that, either Scott Wolf or MMQB, Inc. was the intended beneficiary of, or actually received any benefit from, the initial transfer of the MMQB business front Zig Zag to ZZC (indeed MMQB, Inc. was not even in existence, per the allegations, at the time of that initial transfer). As such, both may properly be deemed subsequent transferees. See Bonded Fin. Serv's., Inc. v. European Am. Bank , 838 F.2d 890, 895 (7th Cir. 1988) (noting that one may not be both the entity for whose benefit the initial transfer was made and a subsequent transferee).

Such an expert report would need to have been prepared for that purpose. As it stands, the expert report provided clearly only vouches for the value of the MMQB business in late 2011. See Forensic Examination, Docket No. 583, at 86 ("This report was prepared only for the stated purpose and shall not be used for any other purpose."). To the extent that the trustee would rely on the exhibits showing bank transfers attached to his initially-separate complaints against Hound Ventures, SHBM, and MMQB, Inc., the court finds that those are an insufficient basis upon which to liquidate a judgment against any defaulted Defendant for receiving proceeds or profits from the fraudulently transferred MMQB business under section 550(a)(2). Just as one example, on several pages the transferee is listed as "Customer Wolf." See, e.g. , Trustee's Complaint, Docket No. 1, 16ap00483, Ex. A, at 12-17. Who is "Customer Wolf"? Scott, Michael, Peter? The court cannot he left guessing, and even after the entry of a default, it is incumbent upon the plaintiff to provide an adequate factual basis upon which to assess each defaulted party's monetary liability.

Though the court dealt with the trustee's general alter ego count (Count 1) only in relation to the Debtor, not Scott Wolf, that count (Count 1) may fairly be construed as asking for the separateness of all of the entities in this case to be disregarded. Hence this court's conclusion that Scott Wolf consented (by filing a summary judgment motion) to this court's authority to enter final judgment on Count 1 applies to this court's determination that MMQB, Inc. is merely Scott Wolf's alter ego under Delaware law such that Scott Wolf is as much a subsequent transferee as MMQB, Inc. is.

This is separate from his liability as a subsequent transferee of the MMQB business (because of MMQB, Inc.'s alter ego status vis-à-vis Scott). The trustee's success on this theory (the stock transfer theory to Scott Wolf) does not depend on the success of his alter ego/reverse-piercing claim regarding Michael Wolf and Zig Zag. Hence Count 1 is not considered in relation to the trustee's recovery under this theory.

And has not requested that he be allowed to introduce such evidence.

Another way to look at it is to say that the valuation report established the value of the Zig Zag stock, and the Zig Zag stock can fairly be deemed to be equal in value to the ZZC stock because the two entities (Zig Zag and ZZC) only ever held and operated the underlying MMQB business, nothing else.

The trustee, however, may not recover more than $2,100,000 in total, including from Scott Wolf, due to the fact that the prohibition on double recovery clearly applies in this case where the underlying injury to the estate is the loss of the value of the MMQB business, as that value was established in the trustee's report, That value may be recovered in different ways as a formal matter, but it may not be recovered more than once in substance.

Even if such a right existed, no argument has been made that a hearing be held on damages in this case.

The avoidance of the stock-transfer does not depend on the viability of the trustee's alter ego theory.

It is unclear to what extent the second two bases for relief (stock transfer basis and corporate waste basis) are mutually exclusive, in law, of the trustee's first basis for relief (the transfer of the MMQB business from Zig Zag to ZZC). For instance, can the trustee "avoid" the first transfer of the MMQB business to ZZC and then also separately avoid and recover based on the transfer of stock in ZZC from Michael to Scott Wolf using values the stock would have had had the business actually been transferred from Zig Zag to ZZC (despite that transfer having been avoided under the trustee's first basis for relief)? The court does not answer this question because it need not. The first basis for relief, if it is legally mutually exclusive of the second and third bases for relief, alone provides the trustee with the basis for a $2,100,000 recovery from Scott Wolf. The second two theories, which are not legally mutually exclusive of one another , provide that same basis as well ($1,071,000 + $1,029,000 = $2,100,000). Hence the potential inconsistency of the trustee's theories does not, in the final analysis, affect his ability to have a money judgment entered against Scott Wolf in the amount of $2,100,000.